# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

STATE OF NEW YORK, STATE OF
CALIFORNIA, STATE OF ILLINOIS, STATE
OF MARYLAND, COMMONWEALTH OF
MASSACHUSETTS, STATE OF NEW JERSEY,
STATE OF NEW MEXICO, and STATE OF
OREGON,

<em>Plaintiffs,</em>

v.

U.S. DEPARTMENT OF THE INTERIOR,
U.S. FISH AND WILDLIFE SERVICE, and
DANIEL JORJANI, in his official capacity as
Principal Deputy Solicitor Exercising the
Authority of the Solicitor of the Interior,

<em>Defendants.</em>

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

Civil Action No. _____

## INTRODUCTION

1.      Plaintiffs States of New York, California, Illinois, Maryland, New

Jersey, New Mexico and Oregon, and the Commonwealth of Massachusetts (the

"States"), seek a declaration against defendants U.S. Department of the Interior

("Interior"), U.S. Fish and Wildlife Service ("FWS"), and Interior's Acting Solicitor

Daniel Jorjani finding unlawful and vacating Jorjani's recent opinion reinterpreting

the Migratory Bird Treaty Act of 1918 (the "Act" or "MBTA").  The Jorjani opinion is

inconsistent with the Act's text and purposes, is contrary to defendants' previous

longstanding interpretation of the Act and decades of consistent application of that

interpretation, drastically limits the scope of the Act, subjects migratory birds to

increased likelihood of death or injury from industrial and other human activities

that immediately take or kill or are foreseeably likely to take or kill migratory birds, and harms the States' sovereign, ecological, and economic interests in robust federal protections of migratory birds.

2.     The Act makes it unlawful to "take" or "kill" any migratory bird "at any time, by any means or in any manner," unless permitted by regulation.  16 U.S.C. § 703(a).  Congress enacted the MBTA to implement a treaty between the United States and Great Britain (acting on behalf of Canada).  For the past century, the Act has been a foundation of the United States' efforts to conserve and protect migratory birds.

3.     Defendants Interior and FWS (the "Agencies") are responsible for implementing and enforcing the MBTA.  The Agencies have for decades recognized that the expansive prohibition in the Act encompasses all activities that either immediately kill or take migratory birds or reasonably foreseeably result in the death of migratory birds, whether or not the actor specifically intended to take or kill birds.

4.     The Agencies' longstanding recognition that the Act prohibits "incidental take"—taking or killing that reasonably foreseeably results from an activity, but is not the intended purpose of that activity—has provided critical protections for the millions of birds whose movements expose them to death or injury incidental to industrial activities and other human alterations of the natural environment.  The threat of enforcement of the Act has provided a strong incentive to those engaged in activities that may result in incidental taking or killing of birds

2

protected under the MBTA to undertake reasonable, low-cost measures to avoid, minimize, and mitigate such taking or killing.  The U.S. Department of Justice, acting on behalf of the Agencies, has reinforced those incentives and deterred potential violations of the Act by prosecuting those who engaged in activities that resulted in the incidental taking or killing of large numbers of migratory birds, including causing oil spills and failing to cover chemical waste lagoons known to attract birds.

5.     In January 2017, then-Solicitor of the Interior Hilary Tompkins issued a legal opinion reaffirming FWS's longstanding interpretation of the Act. (Memorandum from Hilary C. Tompkins, Solicitor of the Interior, to Director, U.S. Fish & Wildlife Serv., Opinion M-37041, *Incidental Take Prohibited Under the Migratory Bird Treaty Act* (Jan. 10, 2017) (the "Tompkins Opinion"), attached hereto as Appendix A).  The Tompkins Opinion re-confirmed that "the MBTA's broad prohibition on taking and killing migratory birds by any means and in any manner includes incidental taking and killing," and that "the government need not show that a defendant willfully or intentionally took or killed birds to prove a violation of the MBTA."  *Id.* at 2.

6.     Less than a year later, in December 2017, defendants Interior and Daniel Jorjani issued a legal opinion withdrawing and replacing the Tompkins Opinion and reversing the Agencies' longstanding interpretation of the Act. (Memorandum from Daniel H. Jorjani, Principal Deputy Solicitor, to Sec'y of the Interior et al., Opinion M-37050, *The Migratory Bird Treaty Act Does Not Prohibit*

*Incidental Take* (Dec. 22, 2017) (the "Jorjani Opinion"), attached hereto as Appendix B).  The Jorjani Opinion reinterprets the Act, with no intervening change in the law, as prohibiting only activities that "have as their purpose the taking or killing of migratory birds," such as hunting or poaching.  *Id.* at 2, 41.  This new interpretation prohibits the Agencies from exercising their longstanding and consistently applied authority to enforce the Act against those who engage in activities or create conditions that immediately or foreseeably take or kill migratory birds, but which do not have taking or killing birds as their intended purpose.

7.      The new interpretation in the Jorjani Opinion is final and binding on the Agencies.  As such, it is a final agency action that alters existing legal protections for migratory birds and harms the States' interests predicated on those protections.

8.      The Jorjani Opinion harms the States by depriving them of the MBTA's protections of migratory birds that engage in breeding, feeding, and sheltering activities as those birds migrate within and through their territories. The States own and hold these species in trust for their citizenry and benefit from both the specific ecological services these birds provide—including controlling insects and rodents, pollinating, and dispersing seeds—and the role the birds play in maintaining ecological balance generally, including as prey for other animals. The birds also provide scientific, recreational, and birdwatching opportunities and aesthetic benefits enjoyed by many people.  All of these benefits directly or indirectly generate economic activity and tax revenue for the States, which are lost

4

or diminished when bird numbers are depleted by unauthorized activities or conditions that immediately or foreseeably take or kill migratory birds but which do not have taking or killing birds as their intended purpose.

9.      The Jorjani Opinion is unlawful because it contradicts the plain meaning, structure, and intent of the MBTA, including but not limited to the Act's broad prohibition on the taking or killing of migratory birds "by any means or in any manner."  16 U.S.C. § 703(a).  This misinterpretation contravenes the Act's protective purpose and statutory history and conflicts with settled precedent of the Second Circuit.  *See United States v. FMC Corp.*, 572 F.2d 902, 906-08 (2d Cir. 1978) (rejecting argument that the MBTA applies only to affirmative acts that intentionally harm birds).

10.     This Court should therefore declare the Jorjani Opinion unlawful and vacate it.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a).  The Jorjani Opinion is subject to judicial review under the Administrative Procedure Act ("APA") as a final agency action for which there is no other adequate remedy.  5 U.S.C. §§ 702, 704.  The relief sought is authorized by 28 U.S.C. § 2201(a), 28 U.S.C. § 2202, and 5 U.S.C. § 706.

12.     Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(e)(1)(C) because this is a civil action brought against agencies of the United States and officers of the United States acting in their official capacities, and

plaintiff State of New York resides within the district.

## PARTIES

**Plaintiffs**

13.     Plaintiff State of New York is a sovereign state of the United States of America.  As a body politic and a sovereign entity, it brings this action on behalf of itself and as trustee, guardian, and representative of all residents and citizens of New York.  New York owns all wildlife in the State.  N.Y. Envtl. Conserv. Law ("ECL") § 11-0105.  This wildlife includes well over 300 species of migratory birds protected under the Act that nest in or regularly migrate through New York, the overwhelming majority of which migrate outside the State at some point during their lifecycles, and therefore leave New York's jurisdiction and ability to protect them through laws and regulations.  New York has a long and established interest in the study and conservation of birds.  It is home to the National Audubon Society, the Cornell Lab of Ornithology, one of the world's preeminent academic centers for the study of birds, the American Museum of Natural History, and such world-renowned birding destinations as Central Park and Jamaica Bay National Wildlife Refuge.  In 1997, the New York legislature enacted the New York state bird conservation area program to designate state-owned lands and waters of particular value as "important bird areas."  N.Y. Envtl. Conserv. Law § 11-2001.

14.     Plaintiff State of California is a sovereign state of the United States of America.  California Attorney General Xavier Becerra is the chief law officer of California, Cal. Const., art. V, § 13, and is authorized to seek judicial remedies to

protect the natural resources of the State of California from pollution, impairment, or destruction.  Cal. Gov. Code §§ 12600-12612; *see also Pierce v. Super. Ct.*, 1 Cal.2d 759, 761-62 (1934) (Attorney General "has the power to file any civil action or proceeding directly involving the rights and interests of the state . . . and the protection of public rights and interests.").  California is a major part of the Pacific Flyway, a migratory superhighway that runs from Alaska to South America. Millions of migratory birds consisting of hundreds of different species including threatened and endangered species move through California each year.  Migratory birds are vital to California's ecosystem, culture, and economy.  The 2011 National Survey of Fishing, Hunting, and Wildlife Associated Recreation stated that every year, 23% of Californians actively participate in wildlife-associated recreation including more than 6.4 million citizens engaged in wildlife-watching – including viewing migratory birds.  In addition to tens of millions of dollars that migratory-bird watching generates annually for California's tourism industry, California sells tens of thousands of licenses to hunt migratory waterfowl, directly generating millions of dollars in annual revenue for the State.  California brings this action on its own behalf to defend California's rights, obligations, and authority as a sovereign state to protect and defend its interests in maintaining the health and welfare of the natural resources within its jurisdiction, including wildlife and protected species, and for the benefit of its citizens' health, welfare, and aesthetic, scientific, and recreational opportunities.

15.     Plaintiff State of Illinois brings this action by and through Attorney

General Lisa Madigan. The Attorney General is the chief legal officer of the State of Illinois (Ill. Const., art. V, § 15) and "has the prerogative of conducting legal affairs for the State." Env'tl Prot. Agency v. Pollution Control Bd., 372 N.E.2d 50, 51 (Ill. Sup. Ct. 1977). She has common law authority to represent the People of the State of Illinois and "an obligation to represent the interests of the People so as to ensure a healthful environment for all the citizens of the State." People v. NL Indus., 604 N.E.2d 349, 358 (Ill. Sup. Ct. 1992). Illinois, bordered on the west by the Mississippi River, lies on the Central Flyway through which millions of birds migrate north and south annually. The Illinois Wildlife Code protects the hundreds of migratory bird species that nest or winter in, or migrate through the State. 520 ILCS 5/2.2 (2016). Under this law, Illinois has "ownership of and title to all wild birds . . . within the jurisdiction of the State . . ." Id. at 2.1.

16. Plaintiff State of Maryland, a sovereign entity, brings this action by and through its Attorney General, Brian E. Frosh, on behalf of itself and on behalf of its citizens and residents. The Attorney General of Maryland is the State's chief legal officer with general charge, supervision, and direction of the State's legal business. Under the Constitution of Maryland, and as directed by the Maryland General Assembly, the Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Maryland residents with respect to, among other things, protecting the natural resources and environment of the State. Md. Const. art. V, § 3(a)(2); 2017 Md. Laws, Joint Resolution 1, § 7. DOI's interpretation of the MBTA poses just such a

threat.  Of the over 300 species of birds regularly found in Maryland, all but seven are included in the MBTA's 2013 list of protected species.  All 141 of the species that Maryland has designated as Species of Greatest Conservation Need are listed under the MBTA.  A federal government study estimated that wildlife watching, including watching, photographing, and feeding birds, generated over $480 million in Maryland in 2011.  The same study showed that an estimated 27% of Maryland residents are wildlife watchers, and over 900,000 residents and non-residents enjoy birding in the state.  In addition, birds in Maryland play critical roles in pest control and protection of human health; declines in bird populations often indicate environmental issues that affect human health.  Maryland brings this action to protect the public interest in the natural resources within its jurisdiction, including its bird species, and for the benefit of its citizens' health, welfare, and aesthetic, scientific, and recreational opportunities.

17.     Plaintiff Commonwealth of Massachusetts, as a body politic and a sovereign state of the United States of America, brings this action on behalf of itself and as trustee, guardian, and representative of all residents and citizens of Massachusetts.  Massachusetts is the sovereign and proprietary owner of all wildlife within the Commonwealth, which it holds in public trust for the benefit of all of its people. *Dapson v. Daly*, 257 Mass. 195, 196, 153 N.E. 454, 454 (1926).  As early as 1818, the Commonwealth recognized the public health, environmental, and economic benefits that certain migratory birds provided to the Commonwealth and its citizens and became one of the first states in the country to protect them while

they remained in the Commonwealth's territory.  An Act to Prevent the Destruction of Certain Useful Birds at Unseasonable Times of the Year, 1817 Mass. Acts 504-05. This wildlife includes well over 400 species of migratory birds protected under the Act that have been recorded in the Commonwealth, the overwhelming majority of which migrate outside the Commonwealth at some point during their lifecycles and therefore lie outside the Commonwealth's ability to fully protect its interests. Massachusetts is home to world-class birding destinations, including Cape Cod and the Great Meadows National Wildlife Refuge.  Manomet, Inc., a science-based non-profit organization headquartered in Massachusetts, is a leader in research and conservation of certain migratory bird species.  The Commonwealth has relied on the Defendants' prior, longstanding interpretation of the Act to deter activities within and outside of Massachusetts that result in incidental taking or killing of migratory birds.

18.      Plaintiff State of New Jersey is a sovereign state of the United States of America and brings this action on behalf of itself and as trustee, guardian and representative of the residents and citizens of New Jersey.  New Jersey holds wildlife in trust for the benefit of all its people.  The New Jersey Legislature has declared that it is the policy of the State to manage all forms of wildlife to insure their continued participation in the ecosystem.  N.J. Stat. Ann. § 23:2A-2.  Among its diverse assemblage of wildlife, New Jersey counts over 300 species of migratory birds that nest or winter in, or migrate through the State.  Over 40 of these species are waterfowl subject to legal hunting, while 30 currently hold a state "endangered"

or "threatened" status.  New Jersey is home to the Cape May Bird Observatory, managed by the New Jersey Audubon Society, and the 47,000-acre Edwin B. Forsythe National Wildlife Refuge, which serves as nesting habitat for coastal songbirds such as salt marsh and seaside sparrows, and feeding grounds for many species of ducks, geese, herons and egrets. New Jersey maintains key habitats relied upon by migratory birds along the Atlantic flyway and is heavily invested in managing such habitats, including vital foraging and nesting habitats along the coastal Barrier Islands and the Cape May Peninsula.  As an example, New Jersey invests considerable time, resources and funding to manage the red knot. Twice annually, red knots migrate between South America and the Arctic, making a critically important stop in New Jersey and Delaware during the northern migration to feed on horseshoe crab eggs where the red knots must eat enough to continue their arduous journey to the Arctic.  New Jersey depends on its federal partners and other states to equally protect the red knot when it is not in New Jersey.  To fail to do so would result in New Jersey's efforts being squandered and wasted.  Migratory bird protection also has a significant impact upon New Jersey's economy.  In 2011, over 1.2 million New Jerseyans participated in bird watching activities generating $968 million in economic activity, and over 13,000 waterfowl hunters generated economic activity equating to over $10 million to New Jersey's economy.

19.     Plaintiff State of New Mexico brings this action by and through Attorney General Hector Balderas. The Attorney General of New Mexico is

authorized to prosecute in any court or tribunal all actions and proceedings, civil or criminal, when, in his judgment, the interest of the state requires such action.  NMSA 1978, § 8-5-2.  Under the Constitution of New Mexico, "protection of the state's beautiful and healthful environment is . . . declared to be of fundamental importance to the public interest, health, safety and the general welfare. N.M. Const. art. XX, § 21. This provision "recognizes that a public trust duty exists for the protection of New Mexico's natural resources . . . for the benefit of the people of this state." *Sanders-Reed ex rel. Sanders-Reed v. Martinez*, 350 P.3d 1221, 1225 (N.M. Ct. App. 2015).  Tourism, often centered on outdoor recreational activities, is an important driver of New Mexico's economy.  In 2015, tourism accounted for $6.1 billion in direct spending and created roughly 89,000 jobs.  Migratory birds are important to New Mexico's tourism industry.  New Mexico ranks fifth nationally for the portion of bird watchers coming from out of state (46%).  The Bosque del Apache National Wildlife Refuge alone brings in $13.7 million annually from non-residents along with $4.3 million in regional tax revenue.  Established in 1939 to provide a critical stopover for migrating waterfowl, the Bosque del Apache NWR is recognized as one of the premier bird-watching areas in North America, famous for the spectacle of tens of thousands of wintering Sandhill Cranes and Snow Geese, and home to over 340 species of birds. The Refuge is within the Rio Grande Corridor, an important migratory, wintering and nesting corridor for migratory birds within the arid intermountain west that follows the Rio Grande the length of the State from Colorado in the north to Texas in the south.  It supports over 200,000 waterfowl,

18,000 greater sandhill cranes and tens of thousands of other water and shorebirds.

20.     Plaintiff State of Oregon brings this suit by and through Oregon Attorney General Ellen Rosenblum.  The Oregon Attorney General is the chief legal officer of the State of Oregon.  The Attorney General's duties include acting in federal court on matters of public concern and upon request by any state officer when, in the discretion of the Attorney General, the action may be necessary or advisable to protect the interests of the state. Ore. Rev. Stat. § 180.060(1).  The Oregon Department of Fish and Wildlife, established as a state agency by the Oregon Legislature pursuant to Ore. Rev. Stat. § 496.0780, has requested that the Attorney General bring this suit to protect Oregon's sovereign and proprietary interest in maintaining healthy populations of migratory birds.  The Attorney General also brings this suit as *parens patriae* on behalf of the state's affected citizens and residents.  Under Oregon law, "Wildlife is the property of the state."  Ore. Rev. Stat. § 498.002.  As Oregon is a Pacific coast state and part of the Pacific Flyway, migratory birds are a vital part of Oregon's landscape, history, and economy.  The 2011 National Survey of Fishing, Hunting, and Wildlife Associated Recreation stated that 46% of Oregonians actively participate in wildlife-associated recreation including more than 1.2 million citizens engaged in wildlife-watching – including viewing migratory-birds - every year.  Oregon has relied on the federal government's previous longstanding interpretation of the MBTA to protect migratory birds from killing or taking by any means and in any manner, including so-called 'incidental' (non-deliberate) killing or taking.  Indeed, the Oregon

Department of Fish and Wildlife ("ODFW")'s administrative rules specifically state that ODFW "recognizes the authority and role of the federal government as provided by the Migratory Bird Treaty Act of 1918." Or. Admin. R. 635-130-0020). Oregon has relied on the federal government to protect migratory birds both while they are in Oregon and while they are in other States, as the overwhelming majority of migratory birds that spend time in Oregon also spend time in other States, where Oregon has no power to protect them. Under the previous, longstanding federal interpretation of the MBTA, when advising other state agencies, individuals and corporate entities about their responsibility to avoid, minimize, and mitigate for the impacts of their activities on wildlife and habitats, ODFW referred applicants to the FWS for regulatory guidance and best practices relating to migratory birds. The new interpretation of the MBTA jeopardizes the populations of migratory birds that make up a critical base for the wildlife-associated economy that currently thrives in Oregon. By harming migratory birds, the Jorjani Opinion threatens to diminish the quality of birdwatching in Oregon and to reduce State tax revenues generated by that activity.

21.     The States and their citizens, on whose behalf the States hold all wildlife, including migratory birds, in trust, rely on and benefit from the Act's application to incidental take or killing of migratory birds and thus, as described in greater detail below, are injured by the Jorjani Opinion's unlawful reversal of the Defendants' prior, longstanding interpretation and application of the Act. This injury would be remedied by an order vacating it.

14

**Defendants**

22.     Defendant Interior is an agency of the United States government and is responsible for administering and enforcing the Act.

23.     Defendant FWS is also an agency of the United States government and is the bureau within Interior responsible for administering and enforcing the Act.

24.     Defendant Jorjani is the Principal Deputy Solicitor of the Interior.  He signed the challenged legal opinion in his official capacity as Principal Deputy Solicitor exercising the authority of the Solicitor of the Interior.  The States sue Jorjani in that official capacity.

## BACKGROUND

25.     Two recently filed actions pending before this Court also challenge the Jorjani Opinion.  *Natural Resources Defense Council, Inc., et al. v. U.S. Department of the Interior, et al.,* No. 18-CV-4596-VEC ("NRDC Action"); *National Audubon Society, et al. v. U.S. Department of the Interior, et al.*, No. 18-CV-4601-VEC ("Audubon Society Action").  As required by Local Civil Rule 1.6(a) and Rule 13 of the Rules for the Division of Business Among District Judges (Southern District), the States are filing concurrently with this complaint a Related Case Statement.  Because this complaint challenges the same final agency action as the NRDC and the Audubon Society Actions, the States adopt and incorporate by reference as if fully set forth in this Complaint the allegations in the complaints in those actions regarding the statutory history and purpose of the MBTA, the Agencies' long-

standing application of the MBTA to incidental takes and killings, and the genesis

and history of the Jorjani Opinion, specifically Complaint, NRDC Action (Dkt. 1),

¶¶ 19-64, and Complaint, Audubon Society Action (Dkt. 1),  ¶¶ 29-70.

26.    The Act's protective purpose, legislative and statutory history, and

decades of consistent Executive Branch interpretation and application of that

interpretation confirm that the Act applies to incidental takes and killings.

27.    The Jorjani Opinion misconstrues the Act by limiting its application

to only those activities that "have as their purpose" the taking or killing of

migratory birds, and is in direct conflict with FWS's existing regulations codified at

50 C.F.R. § 21.15, which regulate incidental take from military-readiness activities.

28.    The Jorjani Opinion's new interpretation of the Act: (a) contravenes

the Act's plain text and clear purpose to conserve and protect migratory birds; (b) is

inconsistent with both subsequent legislation confirming that the Act regulates

incidental take and killing, and the corresponding incidental take regulations that

FWS promulgated (and which remain in the Code of Federal Regulations), including

a requirement that FWS regulate incidental take from military-readiness activities;

and (c) directly contradicts settled Second Circuit precedent.

29.    The Jorjani Opinion irreparably harms the States' proprietary,

sovereign, economic, recreational, aesthetic, scientific, and environmental interests.

30.    As noted above, the States own all game and wildlife within their

respective borders.  This includes migratory birds, which benefit the States by,

among other things, controlling insect populations, pollinating plants, spreading

seeds, and providing recreational opportunities to the millions of State residents who participate in birdwatching both within and outside their States of residence.

31.     Even if the States took every possible measure to protect migratory birds from incidental take in their respective States, they could not protect migratory birds from incidental take or killing while outside their State boundaries. The Supreme Court recognized the inadequacy of state-level protections for migratory birds almost 100 years ago, reasoning that migratory birds, which "yesterday had not arrived, tomorrow may be in another State and in a week a thousand miles away" can be "protected only by national action in concert with that of another power [i.e., Canada]." *Missouri v. Holland*, 252 U.S. 416, 434-35 (1920).

32.     Unlike other federal environmental statutes such as the Clean Air and Clean Water Acts, the MBTA has no citizen suit enforcement provision that allow states to enforce the Act.  The States are therefore dependent and rely on the Agencies to properly enforce the Act's protections and protect the warblers, swallows, hummingbirds, hawks and other birds that migrate through and beyond their respective territories, and then return each year to eat insects, control rodents, pollinate plants, and provide birding opportunities and other valuable benefits, by preventing the unlawful incidental take or killing of such birds wherever they are in United States jurisdiction.

33.     The Jorjani Opinion injures the States' interests by reversing the Agencies' prior interpretation and thereby eliminating these benefits.

34.     The States have benefitted from the Agencies' prior, longstanding

interpretation of the Act.  Potential MBTA liability for incidental take or killing

previously caused many companies to take reasonable measures to avoid killing and

taking birds.  FWS also previously imposed mitigation measures and other

restrictions on certain activities to reduce death of and injury to birds and caused

certain projects to be relocated to avoid migratory flyways.  And, previously, when

FWS enforced the Act against companies that take or kill migratory birds in

connection with their commercial or industrial activities, the fines recovered for

these MBTA violations funded habitat restoration projects that benefitted the

States' interests.  For example, the U.S. Department of Justice, acting on behalf of

FWS, has collected millions of dollars in penalties from the incidental take or killing

of migratory birds caused by oil spills such as the 2003 Bouchard B-120 oil spill in

Buzzards Bay, Massachusetts, and the 2010 BP Deepwater Horizon Spill in the

Gulf of Mexico.  Those oil-spill-related penalties are directed to the American

Wetlands Conservation Fund where they are used to fund wetlands and bird

habitat restoration projects.

     35.    The Jorjani Opinion will undermine the States' ability to protect

migratory birds within their state boundaries and will endanger migratory birds

that engage in breeding, feeding, and sheltering activities in their States by failing

to protect those birds when they are outside of the State' borders, thus harming the

States' sovereign, economic, recreational, aesthetic, scientific, and environmental

interests in migratory birds.

     36.    The Jorjani Opinion threatens the States' multi-billion-dollar wildlife

18

watching industry. For example, birdwatchers and other wildlife watchers spent approximately $4.2 billion in New York and approximately $2.3 billion in Massachusetts in 2011. In Oregon, migratory bird-associated activities contribute to the more than $2.6 billion annually that is spent in Oregon by residents and visitors on trips and equipment for wildlife-watching, fishing, and hunting, helping to support Oregon's rural economy. In addition, Massachusetts collected nearly $500,000 between 2011 and 2018 from its sale of state waterfowl stamps, which are needed to lawfully hunt migratory waterfowl within the Commonwealth or its coastal waters. *See* Mass. Gen Laws ch. 131, § 13. In Oregon, approximately 19,000 hunters purchase licenses to hunt migratory waterfowl every year. These highly regulated waterfowl hunters have contributed approximately $2.5 million in revenue to the State over the last five years. Other States similarly generate significant funds for their environmental and conservation programs from the sale of waterfowl stamps, which sales depend on sustainable populations of waterfowl. By harming migratory birds, the Jorjani Opinion threatens to diminish the quality of birdwatching in the States and to reduce State revenues generated by that activity, regulated hunting and dependent businesses within the States.

37. Because the Jorjani Opinion now prohibits FWS from enforcing the Act against incidental take or killing, it eliminates companies' incentives to take reasonable measures to avoid taking or killing birds incidental to commercial and industrial activities, or to minimize and mitigate the amount of taking or killing. Companies' failure to take such measures because of the Jorjani Opinion will

19

therefore result in the death of or injury to many birds that otherwise would have been avoided or minimized and mitigated, and will subject certain species to greater risk of becoming threatened or endangered.

38.     The Jorjani Opinion will impair the States' sovereign interests by decreasing the States' regulatory leverage in seeking bird protections in the siting of regulated activities that can negatively affect migratory bird populations.  The lack of a strong federal backstop will provide a disincentive for companies seeking to engage in, or currently engaging in, such activities to cooperate with the States' agencies on implementing strong protections.

39.     The Jorjani Opinion impedes the States' sovereign interest in regulating their natural resources by depriving the States of access to information about bird deaths that FWS had previously collected but no longer does as a result of the opinion.  This information was available to assist the States in the understanding and quantification of human threats to various bird species.  The absence of such information harms the States' ability to prioritize conservation actions towards those species most at risk, as well as those human activities with the greatest negative impacts to birds.

40.      The Jorjani Opinion has also undermined previous efforts by the States, FWS, and industry to develop and revise voluntary guidelines and best management practices to reduce incidental take of migratory birds.

41.     Declaring the Jorjani Opinion unlawful and setting it aside will redress these injuries to the States' interests.

20

## CLAIM FOR RELIEF

## The Jorjani Opinion is Arbitrary and Capricious and Contrary to Law

42.     The States hereby incorporate by reference the allegations contained in Paragraphs 1 through 41 as if fully set forth herein.

43.     Under the Administrative Procedure Act, courts must "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

44.     The MBTA makes it unlawful, unless permitted by regulation, to "take" or "kill" any migratory bird "by any means or in any manner."  16 U.S.C. § 703(a).  This broad prohibition applies to activities and conduct that immediately or foreseeably take or kill migratory birds, whether or not those activities and conduct are specifically intended to take or kill migratory birds.

45.     The Jorjani Opinion's misinterpretation of the Act: (a) contravenes the Act's plain text and clear purpose to conserve and protect migratory birds; (b) is inconsistent with subsequent legislation confirming that the Act regulates incidental take and the incidental take regulations that the FWS promulgated in response (and which remain in the Code of Federal Regulations), including a requirement that FWS regulate incidental take from military-readiness activities; and (c) directly conflicts with settled Second Circuit precedent.

46.      For each and all of these reasons, the Jorjani Opinion is arbitrary, capricious, or otherwise not in accordance with law.

## PRAYER FOR RELIEF

The States respectfully request that this Court enter judgment:

A.      Declaring that the Jorjani Opinion is arbitrary, capricious, or not in accordance with law;

B.      Vacating the Jorjani Opinion;

C.      Awarding plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

D.      Granting such further relief as the Court deems just and proper.


DATED: September 5, 2018

Respectfully submitted,

FOR THE STATE OF NEW YORK

BARBARA D. UNDERWOOD
Attorney General


By: _/s/ Andrew J. Gershon_____
    Andrew J. Gershon (AG 6141)
    *Senior Counsel*
    Matthew Eisenson*
    *Special Counsel*
    Monica Wagner
    *Deputy Bureau Chief*
    Environmental Protection Bureau
    Office of the Attorney General
    28 Liberty St
    New York, NY 10005
    (212) 416-8474
    Andrew.Gershon@ag.ny.gov

FOR THE STATE OF CALIFORNIA

XAVIER BECERRA
Attorney General
DAVID A. ZONANA
Supervising Deputy Attorney General


By:   /s/ Andrew Wiener
     Andrew Wiener*
     Elizabeth Rumsey*
     *Deputy Attorneys General*
     *Attorneys for Plaintiff State of California, by*
       *and through Xavier Becerra, Attorney General*
     1515 Clay Street
     Oakland, CA 94612-0550
     (510) 879-1975
     Andrew.Wiener@doj.ca.gov
     Elizabeth.Rumsey@doj.ca.gov


FOR THE STATE OF ILLINOIS

LISA MADIGAN
Attorney General


By:   /s/ Gerald Karr
     Gerald Karr*
     *Supervising Attorney*
     Jason James*
     *Special Assistant Attorney General*
     Matthew J. Dunn*
     *Chief, Environmental Enforcement/Asbestos Litigation Division*
     69 West Washington, 18th Floor
     Chicago, IL 60602
     (312) 814-3369
     gkarr@atg.state.il.us
     jjames@atg.state.il.us

FOR THE STATE OF MARYLAND

BRIAN FROSH
Attorney General


By: /s/ John B. Howard, Jr.
  John B. Howard, Jr.*
  *Assistant Attorney General*
  Office of the Attorney General
  200 Saint Paul Place
  Baltimore, Maryland 21202
  (410) 576-6300
  www.marylandattorneygeneral.gov


FOR THE COMMONWEALTH OF MASSACHUSETTS

MAURA HEALEY
Attorney General


By:  /s/ Seth Schofield
  Seth Schofield*
  *Senior Appellate Counsel*
  *Assistant Attorney General*
  Megan M. Herzog *
  *Special Assistant Attorney General*
  Environmental Protection Division
  One Ashburton Place, 18th Floor Boston, MA 02108
  (617) 963-2436
  Seth.Schofield@state.ma.us
  Megan.Herzog@state.ma.us

FOR THE STATE OF NEW JERSEY

GURBIR S. GREWAL
Attorney General

By: _/s/ Jung W. Kim_____
     Jung W. Kim*
     *Deputy Attorney General*
     New Jersey Division of Law
     R.J. Hughes Justice Complex
     25 Market Street
     Trenton, NJ 08625
     (609) 376-2804
     Jung.Kim@law.njoag.gov

FOR THE STATE OF NEW MEXICO

HECTOR BALDERAS
Attorney General

By: _/s/ William Grantham_____
     William Grantham*
     Cholla Khoury*
     *Assistant Attorneys General*
     State of New Mexico Office of the Attorney General
     Consumer & Environmental Protection Division
     201 Third St NW, Suite 300
     Albuquerque, NM 87102
     (505) 717-3520
     WGrantham@nmag.gov
     ckhoury@nmag.gov

FOR THE STATE OF OREGON

ELLEN F. ROSENBLUM
Attorney General


By:    /s/ Steve Novick
     Steve Novick*
     Special Assistant Attorney General
      Natural Resources Section
     Oregon Department of Justice
     1162 Court Street NE
     Salem, OR 97301-4096
     (503) 971-1891
     steve.novick@doj.state.or.us


*Not yet admitted to the Bar of this Court.

# APPENDIX A

# TOMPKINS OPINION



**United States Department of the Interior**

OFFICE OF THE SOLICITOR
Washington, D.C. 20240

IN REPLY REFER TO:

**JAN 1 0 2017**

M-37041

Memorandum

To:          Director, Fish and Wildlife Service

From:        Solicitor

Subject:     Incidental Take Prohibited Under the Migratory Bird Treaty Act

## I.    INTRODUCTION

A wide array of human activities and infrastructure incidentally kill or "take" migratory birds. "Take" is an umbrella term that includes, among other things, human actions that kill wildlife. "Incidental take" is take that results from an activity, but is not the purpose of the activity. Some of the activities and infrastructure that incidentally take migratory birds include power lines, pesticide application, communication towers, oil and contaminant spills, oil waste pits, surface-mining tailing ponds, commercial fishing, and wind turbines. In many cases, simple, relatively low-cost methods have proven effective in reducing the impacts of these activities on migratory birds. Some examples include: replacing non-flashing warning lights on communication towers with flashing lights; marking power lines with bird diverters; implementing greater spacing of insulators on powerpoles and other practices to reduce electrocution hazards of power lines; fencing and netting waste pits; updating mining operations to eliminate the use of tailing ponds, and employing streamer lines on longline fishing vessels to reduce seabird bycatch.

The Migratory Bird Treaty Act (MBTA)[1] prohibits unauthorized taking or killing of migratory birds. The U.S. Fish and Wildlife Service (FWS) has long recognized that this prohibition includes incidental taking and killing (which, for brevity, I refer to collectively as "incidental take"). Consistent with that longstanding view, FWS announced in 2015 that it is considering development of regulations to provide legal authorization of incidental take in circumstances in which the take is consistent with the purposes of the MBTA.[2]

The courts have generally agreed with the FWS interpretation of the MBTA as prohibiting incidental take.[3] However, recently a few courts have erroneously construed the prohibition of "take" in the MBTA as limited to hunting and other forms of intentional taking of migratory

---

[1] 16 U.S.C. §§ 703-12.
[2] Migratory Bird Permits; Programmatic Environmental Impact Statement, Notice of Intent, 80 Fed. Reg. 30,032 (May 26, 2015).
[3] *See, e.g., United States v. Apollo Energies, Inc.*, 611 F.3d 679 (10th Cir. 2010).

1

birds.[4]  Because of the confusion caused by the varying case law, the Solicitor's Office has worked closely with FWS to comprehensively review the question of whether the MBTA applies to incidental take.  This memorandum opinion presents the Department of the Interior's legal analysis supporting FWS's long-standing interpretation that the MBTA prohibits incidental take.[5]

I explain in detail below the basis for FWS's interpretation of the MBTA, analyzing in turn the text and legislative history of the MBTA, the four treaties underlying the statute, the past agency practice of the FWS in implementing the law, and the relevant case law.  In sum, the MBTA's broad prohibition on taking and killing migratory birds by any means and in any manner includes incidental taking and killing.  Moreover, the prohibitions of the MBTA, as informed by the underlying treaties, are not limited to hunting, poaching, or any particular factual context; rather, they extend generally to unauthorized take or killing of migratory birds, including take that is incidental to industrial or commercial activities.  The MBTA imposes strict liability (with narrow exceptions) for misdemeanor violations resulting from unauthorized take, incidental or otherwise.  Therefore, the government need not show that a defendant willfully or intentionally took or killed birds to prove a violation of the MBTA.  Liability under the MBTA is bounded by limits of proximate causation, however, and applies to "direct" take where there is a close causal connection between an action and its effect of taking migratory birds.[6]

## II.    THE MIGRATORY BIRD CONVENTIONS

In 1916, the United States and Great Britain (on behalf of Canada), signed a convention to protect migratory birds.  Congress enacted the MBTA in 1918 to implement that convention.  The United States later signed three more bilateral conventions with Mexico, Japan, and Russia to protect migratory birds.  After each convention, Congress amended the MBTA to cover the species addressed in the new convention.  Because a primary purpose of the MBTA is to comply with the four underlying conventions, I first consider the convention language relevant to incidental take.[7]

---

[4] *See, e.g., United States v. CITGO Petroleum Corp*, 801 F.3d 477 (5th Cir.  2105) (CITGO) (holding that "take" applies only to hunting and poaching situations).

[5] FWS's long-standing interpretation reflects its consideration that the MBTA's prohibition of take "by any means and in any manner" unambiguously includes incidental take.  However, to the extent that the MBTA could be considered ambiguous on that issue, the Service's interpretation, as clarified in this Opinion and accompanying new section of the U.S. Fish & Wildlife Service Manual at 720 FWS 3, is entitled to *Chevron* deference as the expert agency's interpretation of a statute it administers.  *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 844–45 (1984).  Even were a court to find *Chevron* deference inapplicable, the Service's long-standing interpretation is certainly entitled at a minimum to *Skidmore* deference as the thoroughly considered, valid, and reasonable administrative judgment of FWS that it has consistently held for at least the last 40 years.  *See United States v. Mead Corp.*, 533 U.S. 218, 228 (2001) quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

[6] Note that "incidental take" and "intentional take" are NOT equivalent to "indirect take" and "direct take."  As discussed below, the latter terms relate instead to the closeness of the causal connection between an action and its effect of taking migratory birds.  Thus, it is possible to have incidental take that is direct and incidental take that is indirect.  This distinction is important because, as also discussed below, the prohibitions of the MBTA do not apply to indirect take, such as that caused by habitat modification.

[7] This primary purpose is inherent in the name of the statute and expressly referenced in its provisions.  *See* 16 U.S.C. §§ 712 & 704(a).

The 1916 convention with Canada declares the goal of the parties to ensure the preservation of migratory birds due to their "great value as a source of food or in destroying insects."[8]  The convention covers not only "Game Birds," but also "Nongame Birds" and "Insectivorous Birds" that are not hunted.[9]  The convention requires the United States and Canada to establish closed hunting seasons for migratory birds, to prohibit the taking of nests and eggs except for scientific or propagating purposes, and to restrict shipment or export of migratory birds or eggs during closed seasons.[10]  The convention authorizes permits to kill migratory birds if they become "seriously injurious" to "agricultural or other interests."[11]  The Canada Convention was substantially revised in 1995.[12]  The revised convention declares the commitment of the parties to the long-term conservation of shared species of migratory birds through a comprehensive international framework, including "monitoring, regulation, enforcement and compliance."[13]  Article IV of the revised convention requires each country to use its authority to "seek means to prevent damage to [migratory] birds and their environments, including damage from pollution."[14]  The convention authorizes the parties to allow the taking of migratory birds at any time of the year for scientific, educational, propagative, or "other specific purposes consistent with the conservation principles of this Convention."[15]

The 1936 convention with Mexico declares the parties' intent to protect migratory birds by means of "adequate methods which will permit, in so far as the … parties may see fit, the utilization of said birds rationally for purposes of sport, food, commerce, and industry."[16]  The convention calls for the parties to establish laws and regulations to ensure the protection of migratory birds, including establishment of closed seasons, establishment of refuge zones, and other restrictions on hunting of migratory birds.[17]  Like the convention with Canada, the convention with Mexico protects both "migratory game" and "migratory non-game" birds.[18]

The conventions with Japan, entered into in 1973, and Russia, in 1976, broadly recognize the value of migratory birds for a wide range of purposes and commit the parties to protect migratory bird species.  Each convention calls for the parties generally to prohibit the taking or sale of migratory birds and eggs, but authorizes the parties to allow exceptions to those prohibitions for specified purposes, including hunting during established seasons, and more generally "for scientific, educational, propagative, or other specific purposes" not inconsistent with the

---

[8] Convention between United States and Great Britain for the Protection of Migratory Birds, proclamation, 39 Stat. 1702 (Aug. 16, 1916) (Canada Convention).
[9] *Id.* art. I, 39 Stat. at 1702–03.
[10] *Id.* arts. II–VI, 39 Stat. at 1703–04.
[11] *Id.* art. VII, 39 Stat. at 1704.
[12] Protocol Between the Government of the United States and the Government of Canada Amending the 1916 Convention Between the United Kingdom and the United States of America for the Protection of Migratory Birds, Sen. Treaty Doc. 104–28 (Dec. 14, 1995).
[13] *Id.* art. II.
[14] *Id.* art. IV.
[15] *Id.* art. II.
[16] Convention for the Protection of Migratory Birds and Game Mammals, art. I, 50 Stat. 1311 (Feb. 7, 1936).
[17] *Id.* art. II.
[18] *Id.* art. IV.

principles or objectives of the conventions.[19]  In addition, each of the conventions with Japan and Russia calls for the parties to prevent damage to birds and their environments.[20]

These conventions require the United States to provide mechanisms for protecting migratory birds and their habitats from all threats.  Although the original convention with Canada and the convention with Mexico focus principally on mechanisms to regulate the hunting of migratory birds, both conventions protect all species of migratory birds, including non-game species, from extermination or indiscriminate slaughter.  The major threat to conservation of migratory birds in 1916 was undoubtedly commercial hunting, but other significant threats that could not possibly have been anticipated in 1916 have developed over the past 100 years, including many activities that incidentally take birds, such as power lines, communication towers, oil waste pits, surface-mining tailing ponds, and wind farms.[21]  Consequently, the Canada Convention was, as noted above, amended and expanded in 1995 to call for a comprehensive approach to conservation of migratory birds, including monitoring, regulation, and enforcement.  The later conventions with Japan and Russia each call for implementing legislation that broadly prohibits the take of migratory birds, subject to specified exceptions.  Finally, the conventions with Japan and Russia, and the amended convention with Canada, all call for the parties to take action to prevent damage to migratory birds and their environments.

While the migratory bird conventions do not specifically address regulation of take of migratory birds that occurs incidental to other activities, their provisions broadly support the regulation of the taking and killing of migratory birds by any means, including by industrial or commercial activities unrelated to hunting.  In fact, Canada stated in a diplomatic note to the State Department that it was the parties' "mutually held interpretation" of the Canada Convention that it would be consistent with that convention for Canada to make "the authorization of incidental take contingent on compliance with approved conservation measures."[22]  Congress plainly intended the MBTA to implement all of these treaties, including the later conventions with Russia and Japan, and the amended convention with Canada, since in each instance Congress amended the MBTA to incorporate each convention as it was adopted by the United States.

---

[19] Convention for the Protection of Migratory Birds and Birds in Danger of Extinction, and Their Environment, 25 U.S.T. 3329, T.I.A.S. No. 7990 (Mar. 4, 1972) (Japan Convention) art. III; Convention Concerning the Conservation of Migratory Birds and Their Environment, T.I.A.S. No. 9073 (Russia Convention), art. II.1.

[20] Japan Convention, art. V.2(a); Russia Convention, art. IV.1, 2(c).

[21] *See* Note No. 0005 from Canadian Embassy to United States Department of State, at 2 (July 2, 2008) (diplomatic note from Canada to the State Department stating that "incidental take of migratory birds … caused by activities including, but not limited to, forestry, agriculture, mining, oil and gas exploration, construction and fishing activities [has] increasingly become a concern for the long-term conservation of migratory bird populations).

[22] *Id.* at 3; *see also The Queen* v. *J.D. Irving, Ltd.,* slip op. at 2–3 (New Brunswick Provincial Court June 9, 2008) (upholding the constitutionality of Canada's implementing legislation as applied outside the hunting context, and rejecting a narrow interpretation of "take" in the Canada Convention).  Moreover, the doctrine of international comity instructs that the United States and Canada should consistently interpret the Canada Convention.  Comity is particularly important in the context of ensuring consistent domestic application of a treaty between two nations. *See, e.g., Hilton v. Guyot,* 159 U.S. 113, 163–64 (1895) ("Comity, in the legal sense … is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.").

## III.   THE TEXT OF THE MBTA AND ITS LEGISLATIVE HISTORY

### A.  The MBTA

The MBTA provides for the conservation of birds, and implements the four bilateral conventions signed by the United States and nations that share migratory birds.[23]  The MBTA makes it unlawful to, among other things, "take" or "kill" migratory birds, unless that taking or killing is authorized pursuant to regulation.[24]  In this context, "migratory bird" means any bird protected by any of the conventions, and includes almost all bird species in the United States.[25]  The MBTA grants the Secretary of the Interior broad authority to issue regulations to authorize otherwise prohibited activities,[26] and as may otherwise be necessary to implement the conventions.[27]  "Take" is currently defined in FWS's general wildlife regulations as "to pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to pursue, hunt, shoot, wound, kill, trap, capture, or collect."[28]  Neither "take" nor "kill" is defined in FWS's MBTA-specific regulations.

The MBTA does not require a particular mental state for a violation of its prohibitions.  Section 2 of the MBTA as originally passed read:

> Unless and except as permitted by regulations made as hereinafter provided, *it shall be unlawful to* hunt, *take*, capture, *kill*, attempt to take, capture or kill, possess, offer for sale, sell, offer to purchase, purchase, deliver for shipment, ship, cause to be shipped, deliver for transportation, transport, cause to be transported, carry or cause to be carried by any means whatever, receive for shipment, transportation or carriage, or export, at any time or *in any manner*, *any migratory bird*, included in the terms of the [Canada convention] or any part, nest, or egg of any such bird.[29]

Unless authorized by the Federal Government, the taking or killing of a covered bird "in any manner" was prohibited, without reference to a mental state.  Neither did the original remedy provision in section 6 require a particular mental state:

> Any person, association, partnership, or corporation who shall violate any provisions of said conventions or of this Act, or who shall violate or fail to comply with any regulation made pursuant to this Act, shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined not more than $500 or be imprisoned not more than six months, or both.[30]

---

[23] *See* 16 U.S.C. § 703.
[24] *Id.*
[25] 50 C.F.R. § 10.13.
[26] 16 U.S.C. 704(a).
[27] *Id.* § 712(2).
[28] *See* 50 C.F.R. § 10.12.
[29] Act of July 3, 1918, ch. 128, § 2, 40 Stat. 755 (codified as amended at 16 U.S.C. § 703(a)) (emphasis added).
[30] *Id.* § 6, 40 Stat. 756 (codified as amended at 16 U.S.C. § 707(a)).

Thus, the MBTA did not, in its original form, expressly distinguish between incidental take and intentional take or require a particular mental state to violate the statute. And although the MBTA expressly prohibits hunting (except as permitted), the broader prohibitions of the statute (*e.g.*, "take," "kill," "possess") are not limited to that context.

The legislative history of the 1918 Act does not expressly address the applicability of the MBTA to incidental take. The committee reports and floor debate indicate that the primary concerns of Congress in drafting the legislation were the "effective protection of useful migratory birds,"[31] and compliance with the Canada Convention.[32] To be sure, the legislative history refers to overhunting as a cause of the declines of migratory bird populations, but also refers to habitat loss and cites the value of protecting migratory birds for aesthetic and practical reasons unrelated to hunting and poaching.[33]

Subsequent amendments to the MBTA are relevant to the regulation of incidental take. In 1936, Congress revised the language of section 2 of the MBTA in a variety of ways. Most relevant here, the "at any time or in any manner" language was moved to the beginning of the section (eliminating any possible ambiguity as to what it modified) and was strengthened by adding "by any means."[34] The provision thus now reads:

> Unless and except as permitted by regulations made as hereinafter provided in this subchapter, it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture, or kill, possess, offer for sale, sell, offer to barter, barter, offer to purchase, purchase, deliver for shipment, ship, export, import, cause to be shipped, exported, or imported, deliver for transportation, transport or cause to be transported, carry or cause to be carried, or receive for shipment, transportation, carriage, or export, any migratory bird, any part, nest, or egg of any such bird, or any product, whether or not manufactured, which consists, or is composed in whole or part, of any such bird or any part, nest, or egg thereof, included in the terms of the conventions between [the United States and Canada, Mexico, Japan, and Russia].[35]

Next, in 1960, Congress added a felony provision with respect to commercial-related violations to section 6.[36] Thereafter, the act was amended to add references to the later-signed conventions.

---

[31] S. Rep. No. 65-27, at 2 (1917).

[32] H.R. Rep. No. 65-243, at 2 (1918).

[33] S. Rep. No. 65-27, at 2 (1917) (appending letter from Secretary of State incorporating statement from Department of Agriculture); H.R. Rep. No. 65-243, at 2 (1918) (same); *see United States v. Corbin Farm Serv.*, 444 F. Supp. 510, 532 (E.D. Cal.) ("It is undeniable that Congress was concerned with hunting and capturing migratory birds when it enacted the MBTA; the legislative history confirms this concern. The fact that Congress was primarily concerned with hunting does not, however, indicate that hunting was its sole concern."), *aff'd on other grounds*, 578 F.2d 259 (9th Cir. 1978); *Moon Lake Elec. Ass'n v. United States*, 45 F. Supp.2d 1070, 1080–82 (D.D.C. 1999) ("MBTA's legislative history indicates that Congress intended to regulate recreational and commercial hunting" but "also suggests, however, that Congress intended the MBTA to regulate more than just hunting and poaching.").

[34] Act of June 20, 1936, ch. 634, § 3, 49 Stat. 1556.

[35] 16 U.S.C. § 703(a).

[36] Act of Sept. 8, 1960, Pub. L. 86-732, 74 Stat. 866 (codified as amended at 16 U.S.C. § 707(b)).

Three relatively recent amendments to the MBTA speak directly to the question of mental state that must be proven in a prosecution under the MBTA. First, Congress amended section 6(b) in 1986, limiting the felony provision to knowing violations.[37]  Congress did so in response to a court decision holding that the felony provision of the MBTA violated due process for imposing a felony on a strict-liability basis, and was therefore unconstitutional.[38]  As the Senate Report explains, the amendment was meant "to cure the unintended infirmity" identified by the court.[39]  But the report also states that "[n]othing in this amendment is intended to alter the 'strict liability' standard for misdemeanor prosecutions … a standard which has been upheld in many Federal court decisions."[40]

Second, in 1998, Congress amended section 3 of the MBTA to eliminate strict liability for hunting violations involving baiting (the use of grain to attract birds to a hunted field), and instead substituted a negligence standard.[41]  Congress was concerned with issues of fairness raised by application of the strict-liability standard to baiting.[42]  In recommending this amendment, the Senate Report noted that it would create only a narrow exception to the longstanding general rule of strict liability under the MBTA:

> The elimination of strict liability, however, applies only to hunting with bait or over baited areas, and is not intended in any way to reflect upon the general application of strict liability under the MBTA. Since the MBTA was enacted in 1918, offenses under the statute have been strict liability crimes. The only deviation from this standard was in 1986, when Congress required scienter for felonies under the Act.[43]

Finally, in 2002 Congress expressly addressed incidental take under the MBTA in the particular context of military-readiness activities.[44]  In the 2002 legislation, Congress (1) temporarily exempted "incidental taking" caused by military-readiness activities from the prohibitions of the MBTA, (2) required the Secretary of Defense to identify, minimize, and mitigate the adverse effect of military-readiness activities on migratory birds, and (3) directed FWS to issue regulations under the MBTA creating a permanent authorization for military-readiness activities.[45]  This legislation was enacted in response to a court ruling that had enjoined military

---

[37] Emergency Wetlands Resources Act of 1986, Pub. L. 99-645, § 501, 100 Stat. 3590.
[38] *See United States v. Wulff*, 758 F.2d 1121 (6th Cir. 1985).
[39] S. Rep. No. 99-445, at 16 (1986).
[40] *Id.*
[41] Migratory Bird Treaty Reform Act of 1998, Pub. L. 105-312, § 102(2), 112 Stat. 2956 (codified at 16 U.S.C § 704(b)).
[42] *See* S. Rep. No. 105-366, at 2 (1998); H. Rep. No. 105-542, at 4-6 (1998).
[43] S. Rep. No. 105-366, at 3 (1998); *see id.* at 2 (describing strict liability as "a hallmark of the law").
[44] Although this legislation directly addressed the implementation of the MBTA, it did not technically amend the MBTA.  Nonetheless, for convenience, I also refer to it as an amendment to the MBTA.
[45] Bob Stump National Defense Authorization Act for Fiscal Year 2003, Pub. L. 107-314, Div. A, Title III, § 315 (2002), 116 Stat. 2509, *reprinted in* 16 U.S.C.A. § 703, Historical and Statutory Notes.  The Stump Act contained conflicting language regarding whether the regulations should be drafted as an authorization or an exemption.  Because the legislation did not actually amend the MBTA, which a true exemption would have required, the Departments of the Interior and Defense concurred that FWS's regulations would be appropriately drafted as an authorization.

7

training that incidentally killed migratory birds.[46]  Significantly, Congress limited the
authorization for military-readiness activities to training and operations related to combat and the
testing of equipment for combat use; it expressly excluded routine military-support functions and
the "operation of industrial activities" from the protection afforded by the 2002 legislation,
leaving such non-combat-related activities fully subject to the prohibitions of the Act.

### B.  Analysis

The text of the MBTA in 1918 did not require a particular mental state for a violation of its
prohibitions, and therefore imposed strict liability.  This conclusion is reinforced by later
amendments to the MBTA.  Similarly, the plain language of the text does not limit the MBTA's
prohibitions to a certain factual context, and there is no legislative history to the contrary.

1.   The original text of the MBTA created a broadly applicable strict-liability crime.

The plain language of the MBTA does not specify a required mental state for most violations.
Although some of the prohibited acts are logically inconsistent with anything other than
purposeful action (hunting, attempting to kill), that fact does not demonstrate congressional
intent to impose a mental-state requirement on other prohibitions that do not logically
incorporate such a requirement.  At the time Congress drafted the MBTA, the words "take" and
"kill" could be interpreted expansively.  A contemporaneous dictionary defined the word "take"
to include "[t]o grasp with the hand or with any instruments; to lay hold of; to seize; to grasp; to
get into one's hold" as well as "[t]o seize or lay hold of and remove; to carry off; to remove
generally."[47]  The word "kill" was defined as "[t]o deprive of life, animal or vegetable, in any
manner and by any means; to put to death; to slay."[48]  Both definitions are sufficiently broad to
encompass actions performed knowingly, negligently, or without any knowledge of
wrongdoing.[49]

I recognize the word "take" had at common law a particular connotation when used in the
context of game animals, denoting the act of reducing a wild animal to possession or control.[50]
But there is no evidence that the common-law meaning of "take" required deliberate or
intentional conduct, as opposed to inadvertent or negligent conduct that reduced wildlife to
human possession or control.  Likewise, there is no reason to believe that Congress intended to
limit the term "take" in the MBTA to hunting or to otherwise require deliberate, intentional
action.  Congress's simultaneous use of the term "kill," a term that certainly lacks any
connotation in common law as being restricted to hunting or intentional conduct, demonstrates
that Congress meant broadly to prohibit actions that cause the death of birds.  At the same time,
it is evident that, by including the terms "hunt" and "kill" within the list of prohibited actions,

---

[46] *Ctr. for Biological Diversity v. Pirie*, 191 F. Supp. 2d 161 and 201 F. Supp. 2d 113 (D.D.C. 2002), *vacated on
other grounds sub nom. Ctr. for Biological Diversity v. England*, 2003 U.S. App. Lexis 1110 (D.C. Cir. Jan. 23,
2003); *see* H. Rep. No. 107-436, at 286, 288 (2002).

[47] Webster's Imperial Dictionary, at 1697–98 (1915).

[48] *Id.* at 922.

[49] *See also United States v. Moon Lake Elec. Ass'n*, 45 F. Supp. 2d 1070, 1078–79 (D. Colo. 1999) (analyzing
similar definitions from a different dictionary, which included "to cause to die" in the definition of "take").

[50] *See, e.g., Geer v. State of Conn.*, 161 U.S. 519 (1896), *overruled by Hughes v. Oklahoma*, 441 U.S., 322 (1979);
*Babbitt v. Sweet Home Chapter Cmtys. for a Great Or.*, 515 U.S. 687, 717 (1995) (Scalia, J., dissenting).

Congress intended the term "take" to mean something other than simply hunting or poaching activity. And, as a final matter, the fact that the migratory bird conventions have always protected non-game and insectivorous species of birds as well as game species, including hundreds of species not subject to hunting or other forms of intentional take, makes it implausible that Congress would have focused exclusively on hunting in enacting legislation to implement the protections of those conventions.

Moreover, all of the prohibitions were modified by the phrase "in any manner," later strengthened to read "by any means or in any manner." This language is extraordinarily expansive and mandates the broadest reasonable interpretation of the scope of the MBTA.[51]  As discussed below, Federal courts have relied upon this language in concluding that the MBTA prohibits incidental take. The MBTA's plain language compels the conclusion that the prohibitions of the MBTA are strict-liability crimes (except in the context of felony prosecutions and baiting cases) and not limited to a particular factual context, such as hunting. The prohibitions of the MBTA thus apply to incidental take.

> 2.  Subsequent MBTA amendments demonstrate the MBTA's strict-liability nature and applicability to incidental take.

My conclusion that the MBTA applies to incidental take is confirmed by the three amendments to the Act discussed above that addressed mental state. The first two amendments, regarding the felony provision and baiting, imposed limited mental-state requirements—those requirements were only necessary if the existing statute's silence with respect to mental state meant that no particular mental state was required. Likewise, the third amendment, which specifically authorized incidental take related to military-readiness activities, can only be understood as reflecting congressional understanding that the Act otherwise prohibits incidental take.

The legislative history of these amendments to the MBTA demonstrates that multiple subsequent Congresses understood, and reaffirmed, that the MBTA was a strict-liability statute. Those Congresses did not change this "hallmark of the law,"[52] but instead crafted narrow amendments to address particular circumstances where they believed strict liability was unwarranted. Had Congress wanted to remove strict liability as the default mental state under the MBTA, Congress would not have proceeded in such a piecemeal fashion. In 1986, Congress could have amended the statute to change the default mental state for *any* violation to a knowing violation. Instead, it applied the knowing standard only to felonies: the Senate Report emphasizes that "[n]othing in this amendment is intended to alter the 'strict liability' standard for misdemeanor prosecutions."[53]  Similarly, in 1998, Congress amended the MBTA to correct a perceived unfairness related to applying the strict-liability standard to the baiting context. Again, the resulting amendment targets the particular problem and nothing further—"elimination of strict liability" in the baiting context was "not intended in any way to reflect upon the general

---

[51] *See Virginia v. Tennessee*, 148 U.S. 503, 519 (1893) ("Where any particular word is obscure or of doubtful meaning, taken by itself, its obscurity or doubt may be removed by reference to associated words. And the meaning of a term may be enlarged or restrained by reference to the object of the whole clause in which it is used.").
[52] S. Rep. No. 105-366, at 2 (1998).
[53] S. Rep. No. 99-445, at 16 (1986).

application of strict liability under the MBTA."[54]  And in 2002, Congress could simply have amended the MBTA to expressly exclude incidental take from its prohibitions; instead, Congress authorized incidental take only by military-readiness activities (and explicitly excluded the "operation of industrial activities" from this authorization).

I acknowledge that there is an enormous and varied body of case law discussing the relevance of a later Congress's interpretation of preexisting law.  It is widely recognized that the intent of the Congress that enacted the relevant provision controls,[55] and views of subsequent Congresses are not *necessarily* dispositive as to the meaning of prior Congresses in passing legislation.[56]  In some circumstances courts give such views little or no weight to subsequent legislative interpretations,[57] while in others, courts give great weight.[58]

To determine the appropriate weight to give subsequently expressed views by Congress, the courts consider a number of factors that generally relate to the context in which those views were expressed.[59]  Thus, the Supreme Court has rejected giving significant weight to subsequent views in the following circumstances: those views are merely inferred by analogy to treatment of the issue in other subsequent legislation;[60] those views were made promoting relevant but unsuccessful legislation;[61] or those views are found in isolated statements by individual members or committees,[62] particularly if not in the context of an amendment to the applicable law.[63]

In contrast, in circumstances in which the subsequent Congress actually enacts new law declaring the intent of an earlier statute, courts give great weight to the views of the subsequent Congress.[64]  This principle applies in circumstances in which the new legislation did not expressly declare the intent of the earlier statute, but the new legislation is premised on a particular interpretation of the earlier statute.[65]  Giving weight to subsequent interpretations of Congress is particularly appropriate when the precise intent of the original enactment is "obscure,"[66] and this principle applies with special force when combined with the principle of

---

[54] S. Rep. No. 105-366, at 3 (1998).

[55] *E.g., Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 758 (1979).

[56] *E.g., Bell v. New Jersey*, 461 U.S. 773, 784–85 (1983).

[57] *See, e.g., Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 354 n.39 (1977).

[58] *See, e.g., Red Lion Broad. Co. v. Fed. Commc'ns Comm'n*, 395 U.S. 367, 380–82 (1969).

[59] *See Liberty Mutual Ins. Co. v. Commercial Union Ins. Co.*, 978 F.2d 750 (1st Cir. 1992) (stating that in case-by-case analysis of what weight to give subsequent legislative interpretation, "context is all-important").

[60] *See United States v. X-Citement Video*, 513 U.S. 64, 77 n.6 (1994).

[61] *E.g.*, *United States v. Wise*, 370 U.S. 405, 411 (1962).

[62] *Southeastern Cmty. College v. Davis*, 442 U.S. 397, 412 n.11 (1979); *see also Hagen v. Utah*, 510 U.S. 399, 420 (1994) (contrasting "merely passing references in texts" to "deliberate expressions of informal conclusions about congressional intent" of the Congress that enacted the original language).

[63] *See Dunn v. Commodities Future Trading Comm'n*, 519 U.S. 465, 478–79 (1997) ("legislative dicta" in legislative history of subsequent amendment that made no change to applicable law shed no light on intent of Congress that enacted relevant provision).

[64] *Red Lion*, 395 U.S. at 380–82.

[65] *See Loving v. United States*, 517 U.S. 748, 770 (1996); *cf. United States v. Fausto*, 484 U.S. 439, 453 (1988) ("This classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute.").

[66] *Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 596 (1980).

deference to a long-standing interpretation of the implementing agency.[67]  And at least some weight is accorded not just to the subsequent legislation itself, but also congressional statements in the legislative history of the subsequent legislation.[68]

Here, the actions of subsequent Congresses strongly support the interpretation that the MBTA's prohibitions apply to incidental take.  As discussed above, the intent of the original statute is, at worst, "obscure"—Congress was silent in 1918 as to the required mental state.[69]  As discussed further below, the interpretation of each amending Congress was consistent with longstanding agency practice.[70]  And the subsequent legislative interpretation does not consist of mere opinions of members or committees of a subsequent Congress.  Rather, Congress was enacting new law to address concerns with the existing law.  In doing so, the amending Congresses were necessarily interpreting the existing law.  In other words, "Congress is not merely expressing an opinion on a matter which may come before a court but is acting on what it understands its own prior acts to mean."[71]

Although none of the three amendments amended section 2 of the MBTA or expressly stated that in 1918 Congress intended the MBTA to be a strict-liability statute that applied to incidental take of migratory birds, in each case Congress passed legislation amending the MBTA that can only be understood as being premised on that Congress's interpretation of the original 1918 prohibition.[72]  As discussed above, none of the amendments make sense absent the conclusion that the MBTA is generally a strict-liability statute.[73]  Moreover, the recognition of the strict-liability nature of the MBTA by Congress has been "consistent and authoritative,"[74] and failure to accept that interpretation would "virtually nullify" the amendments.[75]  For example, expressly authorizing incidental take resulting from military-readiness activities would be a legal nullity if that take were not otherwise prohibited.  Although the statements in the committee reports described above may be due less weight than the legislation itself,[76] they are due at least some weight,[77] and in any case merely confirm what logically follows from the text of the original Act and the amendments themselves.

Finally, the context here is not similar to those cases in which the Supreme Court determined that views of subsequent Congresses were entitled to little or no weight in interpreting prior

---

[67] See Red Lion, 395 U.S. at 380–82; Andrus v. Allard, 444 U.S. 51, 57 (1979) (agency interpretation is particularly relevant that Congress twice reviewed and amended statute without disturbing agency interpretation).

[68] See Bell v. New Jersey, 461 U.S. 773, 784–85 (1983).

[69] See Seatrain Shipbuilding Corp., 444 U.S. at 596.

[70] See Red Lion, 395 U.S. at 380–82.

[71] Mt. Sinai Hospital, Inc. v. Weinberger, 517 F.2d 329, 343 (5th Cir. 1975).

[72] See Loving, 517 U.S. at 770; Nat'l R.R. Passenger Corp. v. Boston & Me. Corp., 503 U.S. 407, 419 (1992) (although provision at issue was not itself amended, amendment confirmed agency's interpretation of original statutory language because contrary interpretation would make subsequent amendment superfluous).

[73] See Gozlon-Peretz v. United States, 498 U.S. 395, 405–06 (1991) (subsequent enactment could only be explained by particular interpretation of existing law).

[74] See United States v. Waste Industries, Inc., 734 F.2d 159, 166 (4th Cir. 1984).

[75] See Andrus v. Shell Oil Co., 446 U.S. 657, 672 (1980).

[76] See Consumer Prod. Safety Comm'n, 447 U.S. 102, 117–18 n.13 (1980).

[77] See Bell, 461 U.S. at 784–85.

legislation.[78]  Successful legislation was passed (three times), that legislation directly relates to the question at issue (the mental state required for a violation of the MBTA), and the subsequent legislative history is not limited to isolated statements by individual members or committees.  In fact, a number of the judicial opinions considering the applicable mental state under the MBTA, discussed in greater detail below, expressly refer to the legislative history of the subsequent amendments to the MBTA as confirming the strict-liability nature of the MBTA's prohibitions.[79]

Three subsequent Congresses thus interpreted the prohibitions of the MBTA generally to apply on a strict-liability basis or specifically to apply to incidental take.  Those interpretations are entitled to significant weight.  Moreover, the text of the statutory prohibitions themselves are broadly written, and include no suggestion that any particular mental state is required for a violation to occur.  Therefore, both the text and legislative history of the MBTA strongly support FWS's longstanding conclusion that the Act's prohibitions apply on a strict-liability basis and specifically to incidental take.

My conclusion is also supported by the language of the conventions.  The later conventions include broad prohibitory language as well as language regarding preventing damage to birds and their environments.  Canada stated in a diplomatic note to the United States that the parties agreed that regulation of incidental take is consistent with the Canada Convention.  And Congress viewed the MBTA as sufficiently broad in scope to allow implementation of the later conventions and subsequent protocols by amending the MBTA to include references to them, without expanding the MBTA's prohibitions.

## IV.   PAST AGENCY PRACTICE

Records of enforcement action demonstrate that the government has construed the MBTA as a strict-liability statute at least since 1939.[80]  FWS has consistently interpreted the MBTA to apply to incidental take, as first expressly manifested in enforcement cases.  And while FWS has generally used enforcement discretion rather than authorization by permits to address incidental take in circumstances in which prosecution is not desirable, FWS has authorized incidental take of migratory birds in a variety of appropriate circumstances and has publicly indicated its intent to broaden its program of authorization.  Finally, FWS has acted consistently with this interpretation in other contexts, including its continuing efforts to work with various industries to minimize incidental take, and in its public statements in an international environmental proceeding.  Thus, FWS's longstanding interpretation and implementation of the Act strongly supports construing the MBTA to apply to incidental take.

---

[78] *Cf. Mt. Sinai Hospital, Inc.*, 517 F.2d at 343 (comparing circumstance before it with cases in which subsequent legislative history was given little weight).

[79] *United States v. Boynton*, 63 F.3d 337, 343 (4th Cir. 1995) (in baiting context); *United States v. Apollo Energies, Inc.*, 611 F.3d 679, 686 (10th Cir. 2010) (in incidental-take context); *United States v. Citgo Petroleum*, 893 F. Supp. 2d 841, 845, 847 (S.D. Tex. 2012) (in incidental-take context).  *But see United States v. Chevron USA, Inc.*, 2009 U.S. Dist. Lexis 102682, at *11 (W.D. La. Oct. 30, 2009) (citing case law, discussed above, giving little weight to views of some members of Congress concerning interpretation of statute adopted years before).

[80] *See United States v. Schultze*, 28 F. Supp. 234, 236 (D. Ky. 1939) (finding defendants who had killed doves in the vicinity of a baited field guilty though there was no evidence of any guilty knowledge or intent).

### A. Enforcement

Since at least the early 1970s, FWS and the Department of Justice (DOJ) have brought enforcement cases outside the traditional hunting or poaching context. Over the last 40 years, FWS's Office of Law Enforcement (OLE) has investigated hundreds of activities or hazards that kill birds in the incidental-take context, including oil pits, power-line electrocutions, contaminated waste pools, pesticide application, oil spills (e.g., *Exxon Valdez*, *Deepwater Horizon*), among others. After investigation, the U.S. Government has brought a number of criminal cases for MBTA incidental-take violations. OLE has been judicious in exercising its enforcement authority over incidental take—with respect to hazards or activities that chronically take birds, OLE has generally pursued criminal prosecution only after notifying the industry of the problem, working with it to find solutions, and proactively educating each industry about ways to avoid or eliminate the take of migratory birds.[81] Although, as discussed below, a few courts have rejected MBTA prosecutions for incidental take, the majority have upheld them. Moreover, many prosecutions are not contested, and are successful without resulting in a written judicial opinion.

### B. Authorization of incidental take

Examples of authorized incidental take under the MBTA also confirm that FWS has long interpreted the MBTA to apply to incidental take. Those authorizations would not be necessary if the MBTA did not apply to incidental take.

    1. Regulations granting incidental take authorization to the Armed Forces.

As part of the 2003 National Defense Authorization Act (2003 NDAA), Congress directed FWS to issue regulations that authorize the incidental taking of migratory birds by the Armed Forces during military-readiness activities.[82] Accordingly, in 2007, in coordination and cooperation with the Department of Defense, FWS finalized new regulations to authorize, with limitations, incidental take that results from military-readiness activities of the Armed Forces.[83] As discussed above, the 2003 NDAA demonstrates that Congress interpreted the MBTA to apply to incidental take. But FWS's promulgation of the regulation was also consistent with, and evidence of, the same longstanding interpretation by the FWS itself. Indeed, in justifying the legality of the regulation in the preamble, FWS explained how the authorization of incidental take was consistent with the MBTA and the underlying treaties.[84] Moreover, FWS limited the authorization provided to the Armed Forces in significant ways, retaining authority to suspend or withdraw authorization for incidental take if such take would be incompatible with the migratory bird conventions or result in a significant adverse effect on a population of a migratory bird species.[85] FWS's retention of this authority makes clear that it viewed the Act as applying to

---

[81] *See* Chief's Directive: Enforcement of the Migratory Bird Treaty Act as it Relates to Industry and Agriculture (Nov. 2, 2015).

[82] Pub. L. No. 107-314, 116 Stat. 2509 (2002).

[83] 50 C.F.R. § 21.15.

[84] 72 Fed. Reg. 8931, 8946 (Feb. 28, 2007).

[85] 50 C.F.R. § 21.15.

incidental take by the Armed Forces in circumstances not covered by the special authorization established by the regulations.

    2.  Special purpose permits for incidental take.

The "Special Purpose Permit" regulations allow FWS to issue a permit "for activities that fall outside the scope of specific MBTA permit types."[86]  In some circumstances, FWS has used this authority to issue permits for incidental take under the MBTA.  Most broadly, FWS has since 1996 included MBTA take authorization under § 21.27 in all Endangered Species Act (ESA) section 10(a)(1)(B) incidental-take permits for ESA-listed migratory birds.  Thus, FWS authorizes incidental take under the MBTA, with ESA section 10(a)(1)(B) permits also constituting MBTA incidental-take permits.[87]

FWS also has issued four stand-alone MBTA Special Purpose permits for incidental take of migratory birds to Federal agencies.  Three of these permits authorized incidental take of migratory birds during projects to eradicate exotic, invasive species that were degrading habitat for native species, including migratory birds, on various islands.  These included a rat-eradication project on Anacapa Island off the California coast (2001); a project to remove introduced foxes on Kanaga Island, part of the Alaska Maritime National Wildlife Refuge (2010); and another rat-eradication project on Palmyra Atoll National Wildlife Refuge (2011).  Finally, the Service issued a permit to the National Marine Fisheries Service (NMFS) in 2012 authorizing take of seabirds that occurs as incidental bycatch under NMFS's regulation of the Hawaii-based shallow-set longline swordfish fishery.

    3.  Notice regarding future MBTA incidental-take authorization.

On May 26, 2015, FWS published a notice of intent to prepare a programmatic environmental impact assessment to evaluate the potential environmental impacts of a proposal to develop regulations that specifically authorize incidental take under the MBTA.[88]  The notice is expressly predicated on FWS's interpretation that the MBTA applies to incidental take.[89]

    *C.  Other Consistent Agency Practices and Statements*

FWS has consistently interpreted the MBTA as prohibiting incidental take in other contexts as well.  First, FWS's work with various industries and companies to reduce the incidental take of migratory birds is in part predicated on that take being prohibited by the MBTA.  For example, FWS issued voluntary wind-energy guidelines that provided guidance to wind-energy developers and operators about how to reduce the incidental take of migratory birds.  That guidance stated that compliance with the guidelines would be taken into account when FWS considered referring

---

[86] 50 C.F.R. § 21.27.

[87] *See Habitat Conservation Planning and Incidental Take Permit Processing, Appendix 5—FWS Guidance on Addressing Migratory Birds and Eagles (FWS Only)* (1996), *available at* http://www.fws.gov/endangered/esa-library/pdf/Hcpapp5.pdf.

[88] Migratory Bird Permits; Programmatic Environmental Impact Statement, Notice of Intent, 80 Fed. Reg. 30,032 (May 26, 2015).

[89] *Id.* at 30,034, col. 1.

alleged take for prosecution, but compliance would not absolve developers or operators of MBTA liability.[90]

Second, prior executive branch interpretation of FWS regulations is consistent with FWS's interpretation of "take." Executive Order 13186 states that "take" as defined in 50 C.F.R. § 10.12 "includes both 'intentional' and 'unintentional' take."[91] The Executive Order further defines "unintentional take" as "take that results from, but is not the purpose of, the activity in question."[92]

Third, FWS's longstanding interpretation of the MBTA is also reflected in the position of the United States in an international proceeding. The North American Agreement on Environmental Cooperation (a side agreement to the North American Free Trade Agreement (NAFTA)) set up the Commission for Environmental Cooperation and provided a mechanism for nongovernmental organizations or persons to assert that the United States, Canada, or Mexico is failing to effectively enforce an environmental law. A number of organizations filed a statement with the Commission, asserting that the United States had a policy of failing to enforce the MBTA with respect to incidental take resulting from logging operations. In its response, the United States acknowledged that the MBTA is a strict-liability statute that applies to direct incidental take.[93]

## V.    CASE LAW

### A.  History

The courts originally addressed the question of what mental state was required to violate the prohibitions of the MBTA in the baiting context. "Baiting" is spreading feed to attract birds for hunting purposes.[94] FWS authorizes hunting of migratory birds subject to a variety of conditions.[95] One of those conditions is that the hunting not take place on or over any baited area or by the aid of baiting.[96] Hunting with the aid of baiting is not, of course, a form of incidental take—killing birds is the purpose of the hunting. But because one can have a variety of mental states with respect to the bait—one can intend to hunt with the aid of bait, one can know of the bait but not intend to be aided by it, one can be negligent as to the presence of bait, or one could have no reasonable way of knowing that bait was present—the question of whether

---

[90] USFWS, Land-Based Wind Energy Guidelines, at 6 (2012) (designed to help wind-energy operators minimize impacts to protected wildlife, including incidental take of migratory birds); *see also, e.g.*, APLIC and USFWS, Avian Protection Plan (APP) Guidelines (2005) (comprehensive guidance for reducing incidental take of bird from power structures). *See generally United States v. Friday*, 525 F.3d 938, 959 (10th Cir. 2008) (describing how the Service uses the threat of prosecution to reduce avian mortality caused by power lines).

[91] Exec. Order No. 13186, Responsibilities of Federal Agencies to Protect Migratory Birds, 66 Fed. Reg. 3853, § 2(a) (Jan. 10, 2001).

[92] *Id.* § 2(c).

[93] Response of the United States of America to the Submission Made by the Alliance for the Wild Rockies, et al. under Article 14 of the North American Agreement on Environmental Cooperation, at 3–4 (Feb. 29, 2000) (SEM-99-002), *available at* http://www.cec.org/sites/default/files/submissions/1995_2000/8475_99-2-rsp-e.pdf (last visited Dec. 2016).

[94] *See* 50 C.F.R. § 20.11(k).

[95] *See generally* 50 C.F.R. part 20.

[96] 50 C.F.R. § 20.21(i).

a particular mental state was required under the MBTA was frequently disputed in enforcement actions involving baiting.

Since at least 1939, most courts in baiting cases have concluded that, because Congress deliberately omitted a mental-state requirement, the MBTA's prohibition on taking birds is a strict-liability crime that does not require the government to prove any particular mental state on the part of the defendant.[97]  Thus, the government did not need to prove a hunter intended to lure birds with bait—the hunter violated the MBTA simply by taking a migratory bird over a baited area.  Although these cases were decided in a context where the take itself was in fact intentional (hunting migratory birds), the language that the courts used to explain their conclusions was, consistent with the statutory language, quite broad.[98]

Based on the MBTA's broad prohibition on take of migratory birds by any means or in any manner and the absence of any mental state requirement for a misdemeanor violation, the government has also brought prosecutions for incidental take of migratory birds.  Several prosecutions relating to birds incidentally killed by "oil pits" led to unreported decisions in the early 1970s.[99]  The first two reported decisions in the incidental-take context were issued in 1978.  Both involved the accidental poisoning of birds.

In *United States v. Corbin Farm Service*,[100] the defendants were alleged to have sprayed a pesticide, contrary to the labeling of the pesticide, on a field on which waterfowl repeatedly fed, resulting in the death of a number of ducks.  In response to the defendants' motion to dismiss, the court easily concluded that the incidental killing of migratory birds with poison is prohibited by the broad language of the MBTA ("by any means or in any manner").[101]  Turning to the question of whether intent to kill birds, which was lacking in this case, is required, the court concluded that it was not.[102]  The court reasoned that the MBTA is a "public welfare offense," a class of crime that dispenses with the requirement of a showing of intent.[103]  Thus, "the MBTA can constitutionally be applied to impose criminal penalties on those who did not intend to kill migratory birds."[104]  The court suggested, however, that a crime might not have been committed if the "defendants acted with reasonable care or if they were powerless to prevent the violation."[105]  As the case was at the motion-to-dismiss stage, the court did not decide the factual issue of whether plaintiffs acted with reasonable care.[106]

---

[97] *See United States v. Boynton*, 63 F.3d 337, 343 (4th Cir. 1995) (discussing history).  *But see United States v. Sylvester*, 848 F.2d 520, 522 (5th Cir. 1988) (Fifth Circuit is unique in rejecting strict liability under the MBTA, instead imposing a "should have known" mental state).  *See generally* MICHAEL J. BEAN AND MELANIE J. ROWLAND, THE EVOLUTION OF NATIONAL WILDLIFE LAW 72–75 (3d ed. 1997).

[98] *See, e.g., United States v. Schultze*, 28 F. Supp. 234, 236 (D. Ky. 1939) ("it was not the intention of Congress to require any guilty knowledge or intent to complete the commission of the offense.").

[99] *See, e.g., United States v. Stuarco Oil Co.*, No. 73-CR-127 (D. Colo. July 11, 1973).

[100] 444 F. Supp. 510 (E.D. Cal.), *aff'd on other grounds*, 578 F.2d 259 (9th Cir. 1978).

[101] *Id.* at 531–32.

[102] *See id.* at 532–36.

[103] *Id.* at 535–36 (quoting *Morissette v. United States*, 342 U.S. 246, 256 (1952)).

[104] *Id.* at 536.

[105] *Id.*; *cf. United States v. Park*, 421 U.S. 658, 673 (1975) (suggesting that being powerless to prevent a violation of strict-liability criminal statute could be a defense).

[106] 444 F. Supp. at 536.

In *United States v. FMC Corporation*,[107] a pesticide manufacturer allowed washwater contaminated with a pesticide to escape into a pond, resulting in numerous bird deaths. On appeal of its conviction under the MBTA, FMC argued that its conviction had been improper because it had not intended to kill birds.[108] Analogizing the manufacture of pesticides to "extrahazardous" (or "abnormally dangerous") activities that would support strict liability in a tort context, the court held that, on the facts before it, proof of intent was not necessary.[109] And, although the court expressly cautioned that "[i]mposing strict liability on FMC in this case does not dictate that every death of a bird will result in imposing strict criminal liability on some party,"[110] it also opined that concerns regarding "innocent technical violations" could be addressed via enforcement discretion.[111]

Together, the *Corbin Farm Service* and *FMC* cases represent the initial judicial confirmation of the principle that the MBTA applies to incidental take. In turn, these successful prosecutions under the MBTA for incidental take led to another type of lawsuit: citizen suits against the government. Even though the MBTA has no citizen-suit provision, Federal agencies are generally subject to judicial review of final agency actions under the Administrative Procedure Act (APA).[112] The APA authorizes members of the public to challenge agency action that is arbitrary, capricious, or "otherwise not in accordance with law."[113] Thus, even though the members of the public have no legal remedy against the private entities that violate the MBTA, courts have held that members of the public can file citizen suits seeking to enjoin federal action that they allege violates the MBTA, as that violation may make the action "not in accordance with law."[114]

The first important case involved appeals of a number of district court cases addressing the application of the MBTA to migratory birds killed by logging activity on National Forests. In *Seattle Audubon Society v. Evans*,[115] environmental groups contended that habitat modification that led indirectly to deaths of northern spotted owls constituted "take" under the MBTA. The Ninth Circuit disagreed. The court first noted that the regulatory definition of "take" that applies to the MBTA "describes physical conduct of the sort engaged in by hunters and poachers," and that there is no mention of habitat modification in the MBTA or its regulations.[116] Next, the court examined the distinction between the statutory definition of "take" in the Endangered Species Act and the regulatory definition of "take" under the MBTA.[117] The former definition

---

[107] 572 F.2d 902 (2d Cir. 1978).
[108] *Id.* at 907.
[109] *Id.* at 907–08.
[110] *Id.* at 908.
[111] *Id.* at 905.
[112] 5 U.S.C. §§ 551 *et seq.*
[113] *Id.* § 706(2)(A).
[114] Although it is beyond the scope of this opinion, I note that a Federal agency acting solely in a *regulatory* capacity does not itself "take" or "kill" birds for purposes of the MBTA if birds are subsequently incidentally taken or killed by a third party subject to that regulation. *Protect our Cmtys. Found. v. Jewell*, 825 F.3d 571, 586 (9th Cir. 2016). That said, Federal agencies in that circumstance may have obligations under Executive Order 13186, Responsibilities of Federal Agencies to Protect Migratory Birds, 66 Fed. Reg. 3853 (Jan. 10 2001).
[115] 952 F.2d 297 (9th Cir. 1991).
[116] *Id.* at 302.
[117] *Id.* at 303.

includes "harm,"[118] further defined by regulation to include habitat modification in certain circumstances,[119] while the latter does not include "harm" in its definition of "take."[120] The Ninth Circuit agreed with the district court that these differences are "distinct and purposeful."[121] Finally, the appellate court distinguished *FMC* and *Corbin Farm Service* on the basis that those cases involved direct, although unintended, bird poisoning; the court did not read those cases as suggesting "that habitat destruction, leading indirectly to bird deaths, amounts to the 'taking' of migratory birds" under the MBTA.[122] Thus, under the Ninth Circuit's analysis, the crucial factor in the application of the prohibitions of the MBTA was whether the action in question directly or indirectly resulted in bird deaths.[123]

Apparently in response to the holding in *Seattle Audubon*, plaintiffs began to allege not just indirect take caused by habitat modification, but also direct taking of migratory birds when Federal agencies undertake or approve land-management activities during nesting season. These claims under the APA had some success, allowing some district courts in other circuits to distinguish *Seattle Audubon*, follow *Corbin Farm Service* and *FMC*, and hold that timber harvesting that directly kills birds (as opposed to harming birds by affecting their habitat) is a violation of the take prohibition.[124]

Other courts rejected application of the MBTA in the logging context. One of these, *Mahler v. U.S. Forest Service*,[125] contains a detailed rebuttal of the harmonization of *Seattle Audubon*, on the one hand, and *Corbin Farm* and *FMC*, on the other. In *Mahler*, the district court acknowledged that application of the MBTA to incidental take "draws substantial support from the statutory language and from case law developed in criminal cases."[126] Nonetheless, the court concluded that the MBTA "applies to activities that are intended to harm birds or to exploit harm to birds, such as hunting and trapping, and trafficking in birds and bird parts. The MBTA does

---

[118] 16 U.S.C. § 1532(19).

[119] 50 C.F.R. § 17.3.

[120] 50 C.F.R. § 10.12.

[121] 952 F.2d at 303.

[122] *Id.*

[123] Note that the direct versus indirect dichotomy presented by the Ninth Circuit can be more precisely resolved as a legal matter by determining whether the action taken was the proximate cause of the resulting bird deaths. Timber harvesting that directly kills nesting birds when trees are felled is more clearly the proximate cause of those deaths than timber felling as habitat loss, which has a more attenuated effect—the potential death of birds through increased competition for reduced resources at some unknown point in the future. *See, e.g., United States v. Moon Lake Elec. Ass'n*, 45 F. Supp. 2d 1070, 1085 (D. Colo. 1999). A previous appellate case rejected an MBTA claim on different grounds. *Defenders of Wildlife v. Envtl. Prot. Agency*, 882 F.2d 1294, 1302–03 (8th Cir. 1989) (court rejected claim against EPA alleging that its regulation of pesticides under Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. §§ 136–136y, resulted in migratory birds being poisoned, holding that FIFRA provided the exclusive means of judicial review of EPA's pesticide decisions).

[124] *Sierra Club v. Martin*, 933 F. Supp. 1559, 1564–65 (N.D. Ga. 1996), *reversed on other grounds*, 110 F.3d 1551 (11th Cir. 1997); *see Sierra Club v. U.S. Dept. of Agric.*, 1995 U.S. Dist. Lexis 21507, at *54–59 (S.D. Ill. Sept. 23, 1995) (distinguishing between claims relating to indirect and direct takings, rejecting claim of indirect taking, citing *Seattle Audubon*, finding that Forest Service had not adequately addressed direct take claim, and directing Forest Service to address issue on remand), *aff'd*, 116 F.3d 1482 (7th Cir. 1997); *see also Ctr. for Biological Diversity v. Pirie*, 191 F. Supp. 2d 161, 175 (D.D.C. 2002) (holding that military live-fire exercises that incidentally killed migratory birds violated the MBTA), *vacated on other grounds sub nom. Ctr. for Biological Diversity v. England*, 2003 U.S. App. Lexis 1110 (D.C. Cir. Jan. 23, 2003).

[125] 927 F. Supp. 1559 (S.D. Ind. 1996).

[126] *Id.* at 1576.

not apply to other activities that result in unintended deaths of migratory birds."[127]  Looking at the statutory language, the court emphasized the lack of any express indication that Congress intended the MBTA to apply to incidental take, and concluded that, in context, the "by any means or in any manner" language should be understood to ensure that all means of hunting or capturing birds were covered.[128]  Next, the court asserted that the history of the statute (at that time) did not show any concern for incidental take of migratory birds.[129]  The court also noted that a broad interpretation of the MBTA's prohibitions was inconsistent with the decades of logging without criminal prosecutions under the MBTA, and that application of the MBTA would substantially restrict, or even effectively prohibit, most logging.[130]  Finally, the court found that the "apparent lack of any meaningful limits" on applying the MBTA to incidental take mitigated against that interpretation.[131]  Courts in two other logging cases expressed similar conclusions with little analysis.[132]  And decisions in a few APA cases in other contexts have included language at least suggesting that the MBTA may not apply to certain incidental take.[133]

After *Seattle Audubon*, courts addressing arguments by criminal defendants that the MBTA does not apply to incidental take had to consider the holdings and reasoning of the APA cases.  Thus, a prosecution involving electrocution of raptors by power lines resulted in a decision that strongly rebutted the analysis in *Mahler*.  In *United States v. Moon Lake Electric Ass'n*,[134] the district court distinguished between two questions: (1) whether the MBTA applies only to intentionally harmful conduct, and (2) whether the MBTA proscribes only physical conduct normally associated with hunting and poaching.  The court easily disposed of the first question, holding that because the misdemeanor provision of the MBTA is a strict-liability crime, the statute could not be limited to conduct requiring any form of intent.[135]  The court then embarked on a detailed analysis of the hunting-and-poaching issue.

---

[127] *Id.* at 1579.
[128] *Id.* at 1579–80.
[129] *Id.* at 1580–81.
[130] *Id.* at 1581–82.
[131] *Id.* at 1582–83.
[132] *Curry v. U.S. Forest Service*, 988 F. Supp. 541, 549 (W.D. Penn. 1997); *Newton County Wildlife Ass'n v. U.S. Forest Serv.*, 113 F.3d 110, 115 (8th Cir. 1997) (dicta).
[133] *City of Sausalito v. O'Neill*, 386 F.3d 1186 (9th Cir. 2004) (following *Seattle Audubon* and rejecting MBTA claim regarding Park Service tree cutting because take alleged to occur only indirectly through habitat modification); *Protect Our Cmtys. Found. v. Salazar*, 2013 U.S. Dist. Lexis 159281, at *55 (S.D. Cal. Nov. 6, 2013) (in challenge to DOI's approval of wind-energy project, court concluded that plaintiffs failed to demonstrate that a permit is required under the MBTA for unintentional killing; *Protect Our Cmtys. Found. v. Jewell*, 2014 U.S. Dist. Lexis 50698, at *59 (S.D. Cal. Mar. 25, 2014) ("Indeed, the governing interpretation of the MBTA in the Ninth Circuit is quite narrow and holds that the statute does not even prohibit incidental take of protected birds from otherwise lawful activity.") (citing *Seattle Audubon*), *aff'd on other grounds*, 825 F.3d 571 (9th Cir. 2016) (notably, the Ninth Circuit did not cite *Seattle Audubon* and stated that "BLM's decision to grant [a wind-energy company's] right-of-way request was many steps removed in the causal chain from the potential commission of an unlawful 'take' caused by wind-turbine collisions," implying that incidental take caused by the wind-energy company's turbine operations could be prohibited by the MBTA).  *But cf. Protect our Cmtys. Found. v. Black*, No. 14-cv-2261 JLS (JMA), at 14 n.8 (S.D. Cal. Mar. 29, 2016) (stating, in determining whether BLM violated the Bald and Golden Eagle Protection Act and the MBTA in approving a wind project that may take eagles, that "agencies have the authority to authorize conduct that would otherwise violate a law—for example, FWS's ability to authorize incidental take of eagles.").
[134] 45 F. Supp. 2d 1070 (D. Colo. 1999).
[135] *Id.* at 1073–74.

Addressing the statutory language, the court noted that of the long list of prohibitions found in the statute or the regulatory definition of "take," only four (hunting, capturing, shooting, and trapping) "identify conduct that could be construed as solely the province of hunters and poachers."[136]  The court also explained that the prohibition of "killing" "by any means and in any manner" suggested that Congress intended broader application, rather than punishing only those who act with specific motives.[137]  And the court noted that Congress was aware that the MBTA had been interpreted to apply beyond hunting and poaching.[138]

Next, the court addressed the contrary case law, discussing *Seattle Audubon* and *Mahler* at length.  Regarding *Seattle Audubon*, the *Moon Lake* court took no position regarding the MBTA's applicability to take caused by habitat modification, but to the extent that *Seattle Audubon* "may be read to say that the MBTA regulates only physical conduct normally associated with hunting and poaching, its interpretation of the MBTA is unpersuasive."[139]  In particular, the court found *Seattle Audubon*'s distinction between direct and indirect takings to be illogical, conflating the concepts of causation and "*actus reus*" (wrongful act), and reading into the MBTA a mental-state requirement that ignores the strict-liability nature of the misdemeanor provision.[140]  After noting "that Congress reviewed and substantively amended the MBTA in 1986 without attempting to vitiate the holdings of *FMC* . . . and *Corbin Farm*,"[141] the court examined contemporaneous dictionary definitions of "kill" and "take" and found nothing to suggest that they apply only to a "direct" application of force.[142]

Turning to *Mahler*, the *Moon Lake* court found that *Mahler*'s reliance on legislative history was unwarranted, as the prohibition on killing migratory birds by any means and in any manner is not ambiguous.[143]  Nonetheless, the *Moon Lake* court engaged in a detailed examination of the legislative history of the 1918 Act,[144] and concluded that it suggests "that Congress intended the MBTA to regulate more than just hunting and poaching."[145]  The *Moon Lake* court also rejected *Mahler*'s reliance on an absence of criminal prosecutions—although there had been no previous prosecutions based on bird deaths caused by power lines, the court noted that the government had instituted at least five MBTA prosecutions against private companies without the physical conduct normally associated with hunting and poaching.[146]  Finally, the *Moon Lake* court addressed *Mahler*'s concern about the unreasonableness of the government's interpretation. Although agreeing "that courts should not rely on prosecutorial discretion to ensure that a statute does not ensnare those beyond its proper confines,"[147] the court found other reasons for concluding that a broad reading of the MBTA would not lead to absurd results.  First, in an

---

[136] *Id.* at 1074.
[137] *Id.* at 1074–75 (noting that the prohibition on possession and sale applies regardless of whether the birds were taken illegally).
[138] *Id.* at 1075 (citing hearing relating to Kesterson Reservoir, a government-operated facility that caused migratory bird deaths due to contamination, in which MBTA liability was discussed).
[139] *Id.* at 1076.
[140] *Id.* at 1077.
[141] *Id.*
[142] *Id.* at 1078–79.
[143] *Id.* at 1079.
[144] *See id.* at 1079–82.
[145] *Id.* at 1080.
[146] *Id.* at 1082–83 (citing three oil-pit-related prosecutions, in addition to *FMC* and *Corbin Farm*).
[147] *Id.* at 1084.

MBTA prosecution, the government must prove proximate causation, which requires that the death of the migratory bird be "reasonably anticipated or foreseen as a natural consequence" of the action.[148]  Second, the court noted that exceptions in the MBTA and its regulations allow for reasonable regulation by the Secretary.[149]  Thus, the court rejected the argument that the MBTA prohibits only physical conduct normally exhibited by hunters and poachers.[150]

The opinion in *Moon Lake*, detailed as it was, did not, however, end the debate in the courts hearing MBTA enforcement cases in the incidental-take context.[151]  Since *Moon Lake*, two circuit courts have reached opposite conclusions.

First, the Tenth Circuit affirmed convictions under the MBTA in *United States v. Apollo Energies, Inc.*[152]  *Apollo Energies* was a consolidated appeal of convictions stemming from the death of birds that became trapped in a particular type of oil-drilling equipment ("heater-treaters").  Defendants first argued that the MBTA does not create a strict-liability crime, and that they lacked the required mental state.[153]  The court held that this contention was foreclosed by a previous Tenth Circuit opinion, *United States v. Corrow*,[154] which had held in a possession-and-sale case that misdemeanor violations under the MBTA were strict-liability crimes,[155] and noted that nothing in *Corrow* "lends itself to carving out an exception for different types of conduct,"[156] such as operation of equipment that incidentally takes birds.  In concluding that the MBTA is a strict-liability statute, the *Apollo Energies* court cited the 1986 felony amendment as "evidence the legislative scheme invokes a lesser mental state [than knowingly] for misdemeanor violations."[157]  And the court suggested that the facts of contrary cases might be distinguishable as involving habitat modification, but noted that that case was not before it.[158]  The court continued: "The question here is whether unprotected oil field equipment can take or kill migratory birds.  It is obvious the oil equipment can."[159]

Defendants also made due-process arguments: (1) the MBTA is unconstitutionally vague as to what constitutes a crime; (2) the MBTA does not provide fair notice because of its breadth, reaching innocuous acts several steps removed from bird deaths, and (3) the MBTA violates due

---

[148] *Id.* at 1085.
[149] *Id.*
[150] *Id.* at 1088.
[151] *See United States v. WCI Steel, Inc.*, 2006 U.S. Dist. Lexis 55593, at *6–14 (N.D. Ohio Aug. 10, 2006) (discussing split in cases, without ruling).
[152] 611 F.3d 679 (10th Cir. 2010), *aff'g* 2009 U.S. Dist. Lexis 6160 (D. Kan. 2009); *see also United States v. CITGO Petroleum Corp.*, 893 F. Supp. 2d 841 (S.D. Tex. 2012) (conviction for birds taken in large open tank at a refinery), *rev'd*, 801 F.3d 477 (5th Cir. 2015); *cf. United States v. Van Fossan*, 899 F.2d 636, 639 (7th Cir. 1990) (issue of mental state not raised on appeal, but court noted that it was not plain error to convict defendant without establishing that he knew his actions—purposefully poisoning non-migratory birds—would also kill migratory birds); *United States v. Chevron USA, Inc.*, 2009 U.S. Dist. Lexis 102682, at *8–11 (W.D. La. Oct. 30, 2009) (criminal sanctions for incidental take "clearly proper" in some cases—particularly where otherwise prohibited act foreseeably resulted in death of protected species—but not where take was unforeseeable result of legal act).
[153] 611 F.3d at 683.
[154] 119 F.3d 796 (10th Cir. 1997).
[155] 611 F.3d at 684–85.
[156] *Id.* at 685.
[157] *Id.* at 686.
[158] *Id.*
[159] *Id.*

process as applied to the defendants' conduct.  The court easily disposed of the first of these arguments, holding that the MBTA is broad, but not vague.[160]

Regarding the breadth of the MBTA, the court embraced and elaborated on *Moon Lake*'s assertion that proximate causation (in the form of foreseeability) functions as a limit on MBTA prosecutions: "When the MBTA is stretched to criminalize predicate acts that could not have been reasonably foreseen to result in the proscribed effect on birds, the statute reaches its constitutional breaking point."[161]  Thus, the court concluded that "the MBTA requires a defendant to proximately cause the statute's violation to pass constitutional muster."[162]  To resolve the due process concern, the court required reasonable notice when it is not foreseeable that the specific conduct may result in the death of protected birds.[163]  Turning to the convictions on appeal, the court found that the record demonstrated that the Service had notified one of the defendants of the danger over a year before the bird death resulting in its conviction.[164]  The court reversed the first conviction of the other defendant, as the court found that no reasonable person would have known at that point (without specific notice), that the equipment at issue would lead to deaths of migratory birds.[165]

In contrast to the Tenth Circuit, the Fifth Circuit recently overturned an MBTA conviction for birds taken in a large open tank at a refinery.  In *United States v. CITGO Petroleum Corp.*,[166] the Fifth Circuit began its discussion by citing Justice Scalia's dissent in *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*[167] as support for the proposition that "take" is an ancient common-law term referring to the reduction of wildlife, by killing or capturing, to human control.[168]  The court asserted, without citation to authority, that "[o]ne does not reduce an animal to human control accidentally or by omission; he does so affirmatively."[169]  The court rejected *Moon Lake*'s analysis of definitions of "take" contemporaneous with the passage of the MBTA, stating that the existence of alternative definitions was not determinative, given that "take" was "a well-understood term of art under the common law when applied to wildlife."[170]

---

[160] *Id.* at 688–89.

[161] *Id.* at 690.

[162] *Id.*

[163] *Id.* at 689.

[164] *Id.* at 691.

[165] *Id.*; *see also United States v. Rollins*, 706 F. Supp. 742, 743–45 (D. Idaho 1989) (holding that the MBTA is strict-liability statute, but unconstitutionally vague under the facts of the case, in which the defendant had no reason to believe that his action—pesticide application exercising due care—posed a threat to birds).

[166] 801 F.3d 477 (5th Cir. 2015), *rev'g* 893 F. Supp. 2d 841 (S.D. Tex. 2012); *see also United States v. Ray Westall Operating, Inc.*, 2009 U.S. Dist. Lexis 130674 (D.N.M. Feb. 25, 2009) (holding that MBTA only applies to hunting-and-poaching situations, and elaborating on and updating *Mahler* to some degree, by discussing the treaties underlying the MBTA—finding no express suggestion that the parties intended to require regulation of incidental take—and addressing *Pirie* and the military-readiness amendment—which the court distinguished as direct taking, analogous to hunting); *United States v. Brigham Oil & Gas*, 840 F. Supp. 2d 1202 (D.N.D. 2012) (holding that MBTA only applies to hunting-and-poaching situations).

[167] 515 U.S. 687 (1995).

[168] 801 F.3d at 489.

[169] *Id.*

[170] *Id.*

Next, the court contrasted the MBTA to the ESA and the Marine Mammal Protection Act,[171] which define "take" to include harassing or harming animals. In the court's view, the latter two statutes expressly expanded "take" beyond its common-law origins to include accidental harm to animals by including terms like "harm" or "harass" in the statutory definitions of "take."  In contrast, "[t]he absence from the MBTA of terms like 'harm' or 'harass,' or any other language signaling Congress's intent to modify the common law definition supports reading 'take' to assume its common law meaning."[172]

The court also rejected two traditional arguments supporting application of the MBTA to incidental take.  First, it held that the "by any means or in any manner" language meant only that all manner and means of *hunting* are covered by the prohibition.[173]  Second, the court rejected the argument that the statutory exemption for incidental take resulting from military-readiness activities "implicitly expanded 'take' beyond its common-law meaning."[174]

The *CITGO* court then addressed the *FMC* and *Apollo Energies* decisions.  Noting that those cases did not explore the meaning of "take," the Fifth Circuit stated that they "confuse the *mens rea* and the *actus reus* requirements."[175]  According to the distinctions "inherent in the nature of the word 'taking,'" the act of taking "is not something that is done unknowingly or involuntarily."[176]  This "reveal[s] the strict liability argument as a non-sequitur."[177]

Finally, citing FWS data on the number of birds killed by windows, communication towers, and cats, the court concluded that its interpretation of "take" is bolstered by the absurd results of the government interpretation, which would make all owners of hazards to birds subject to prosecution at will.[178]

It is important to note that because some of the language in CITGO's indictment referred only to "taking" birds, but not to "killing" birds, the Fifth Circuit took the position that only the prohibition of "take" was at issue in this case.[179]  The court indicated in dicta without analysis, however, that the prohibition on killing birds is likewise "limited to intentional acts aimed at migratory birds."[180]

### B. Analysis and Synthesis

There is strong consensus among the courts that Congress's decision not to expressly require a particular mental state for the misdemeanor provision of the MBTA means that the MBTA is a strict-liability statute and therefore does not itself require that the government prove a particular mental state in an enforcement action.  Although some courts find this dispositive as to the

---

[171] 16 U.S.C. §§ 1361–1421h.
[172] 801 F.3d at 490.
[173] *Id.*
[174] *Id.* at 491.
[175] *Id.* at 492.
[176] *Id.*
[177] *Id.* at 493.
[178] *Id.* at 494.
[179] *Id.* at 489.
[180] *Id.* at n.10.

question of whether the MBTA prohibits incidental take, other courts disagree, holding or suggesting that even if the MBTA's misdemeanor prohibition applies on a strict-liability basis in the context of hunting and poaching, take incidental to other activities simply falls outside of the intended scope of the MBTA. However, those cases impermissibly narrow (or choose to ignore) the MBTA's prohibition on take by "any means and in any manner." That language, coupled with the broad language of the underlying treaties, compels the conclusion that the prohibitions of the MBTA apply to take incidentally and proximately caused by any activity.

The cases holding that the MBTA applies to incidental take are correctly decided, and fully support FWS's longstanding and consistent interpretation. As those cases conclude, the text of the MBTA lacks a mental-state requirement. Read literally (and reasonably), the broad language of the prohibition includes incidental take.[181] The legislative history of the original 1918 law is not inconsistent with this view.[182] Moreover, the history of the amendments to the MBTA that relate to required mental states compel this construction.[183] And interpreting the MBTA to apply to incidental take directly furthers Congress's broad purpose to conserve migratory birds in compliance with the conventions that the MBTA implements, which call for the United States to protect all listed species of migratory birds, not just game species.

In addition, for over 40 years in a variety of contexts, the government has consistently applied the misdemeanor provision of the MBTA to incidental take. FWS OLE, in partnership with DOJ, has judiciously brought enforcement actions in the incidental-take context.

The history of the government's defense of APA claims based on the MBTA also confirms the long-standing position of the government. In those cases, the government has argued against application of the APA when other statutes provide exclusive means of judicial review,[184] that the MBTA does not apply to take indirectly caused by habitat modification,[185] that the MBTA does not apply to agencies acting in their regulatory capacity,[186] and that injunctive relief should not be imposed.[187] But the government has never defended itself in these suits by arguing that the MBTA does not apply to incidental take.[188]

Although FWS has largely relied on enforcement discretion to address innocent technical violations of the MBTA, in appropriate circumstances FWS has authorized various parties to incidentally take migratory birds. FWS promulgated 50 C.F.R. § 21.15 (authorizing take incidental to military-readiness exercises), issues MBTA authorizations for incidental take of migratory birds also listed under the ESA and covered under an ESA Habitat Conservation Plan, and has issued other MBTA permits for incidental take, such as the permits for incidental take of birds resulting from efforts to eliminate nonnative mammals. Moreover, FWS is currently undergoing a NEPA process to analyze alternatives for regulations that authorize incidental take

---

[181] *See, e.g., Corbin Farm Serv.*, 444 F. Supp. at 532.
[182] *E.g., Moon Lake*, 45 F. Supp. 2d at 1079–82.
[183] *E.g., Apollo Energies*, 611 F.3d at 686.
[184] *Defenders*, 882 F.2d at 1202–03.
[185] *Seattle Audubon*, 952 F.2d at 303.
[186] *Protect Our Cmtys. Found.*, 2013 U.S. Dist. Lexis 159281, at *51.
[187] *Ctr. for Biological Diversity v. Pirie*, 191 F. Supp. 2d at 163.
[188] *See Mahler*, 927 F. Supp. at 1577, 1578 (noting government's unwillingness to disavow the holdings in *FMC* and *Corbin Farm Service*).

under the MBTA. Finally, FWS's longstanding interpretation of the MBTA is reflected in its interactions with companies and industries that incidentally take migratory birds, as well as in official documents such as the response of the United States to the Commission on Environmental Cooperation.

Considering the text of the statute, the legislative history, the congressional purpose, and the history of agency practice, the cases holding that the MBTA applies solely to activity like hunting and poaching are not persuasive. I address the opinions in *CITGO* and *Mahler* in detail, as they provide the most cogent and authoritative arguments in support of the opposing position.

The *CITGO* court's reasoning was highly dependent on what it called the "common law definition" of "take." Although it is true that, with respect to wildlife, "take" historically has been used in the context of reducing wild animals to human control, the court's assumption that this historical usage is the *exclusive* meaning of "take" is unsupported. With one exception, the authorities cited by the court define "take" by describing what it includes—none of those authorities assert limitations to the scope of "take," or otherwise affirmatively state that nothing else is included in "take." The exception is Justice Scalia's dissent in *Sweet Home*, which made exactly the same unsupported assumption. After noting historical references to "take" in the wildlife context being used to describe reducing wildlife to human possession, the dissent stated, without citation:

> It is obvious that "take" in this sense—a term of art deeply embedded in the statutory and common law concerning wildlife—describes a class of acts (not omissions) done directly and intentionally (not indirectly and by accident) to particular animals (not populations of animals).[189]

But it is not at all obvious that the existence of this understanding of "take" makes all other understandings of take inherently invalid.[190] Tellingly, neither the *CITGO* court nor the *Sweet Home* dissent pointed to another authority that states that incidental take cannot be "take" in the wildlife context, much less a single case in which a prosecution for take was rejected on the grounds that the facts did not constitute "take" in the common-law sense. All that the *CITGO* court and the *Sweet Home* dissent pointed to are authorities stating that reducing wildlife to human control *is* "take." In short, the *CITGO* court and the *Sweet Home* dissent failed to recognize the distinction between the existence of a commonly understood meaning of a term, and the assertion that that meaning is exclusive of other possible meanings.[191] Moreover, a common-law definition does not apply when "common understanding of the word departs largely from the technical meaning it had at the old common law."[192] Thus, even when a term had a clear common-law meaning, the Supreme Court has applied an "ordinary, contemporary, common meaning" of the term that is more consistent with a statute's purpose.[193]

---

[189] 515 U.S. at 718 (Scalia, J., dissenting).

[190] *See Taylor v. United States*, 495 U.S. 575, 593 (1990) (Congress "presumably had in mind *at least* the 'classic' common-law" version of take when it passed the MBTA) (emphasis added).

[191] *See Moskal v. United States*, 498 U.S. 103, 115–17 (1990) (undefined term did not have "*one* meaning" at common law); *United States v. Turley*, 352 U.S. 407, 411–12 (1957) (same).

[192] *Reagan v. United States*, 157 U.S. 301, 302 (1895).

[193] *Perrin v. United States*, 444 U.S. 37, 42 (1979); *see also Taylor*, 495 U.S. at 593–96; *Bell v. United States*, 462 U.S. 356, 360–62 (1983).

The fact that Justice Scalia's discussion on this point "was [not] criticized" by the *Sweet Home* majority,[194] should not be taken as an endorsement by the majority because this discussion was irrelevant given the actual statutory language of the ESA. And, of course, the persuasiveness of Justice Scalia's opinion is strongly limited by its status as a dissent.

The *CITGO* court asserted that the government's argument "is at odds with the common law definition of 'take' in the MBTA regulations."[195] The court's assertion is both technically inaccurate and substantively wrong. It is technically inaccurate because regulations in Part 10 of 50 C.F.R. are not "MBTA regulations," they are generic definitions that apply to all of FWS's wildlife laws.[196] The court's assertion is wrong substantively because the definition of "take" found in 50 C.F.R. § 10.12 is *not* consistent with the "common law definition" described by the court. It does not limit "take" to only the reduction of wild animals to human control. Instead, it includes "kill," "pursue," and "wound," which would not in and of themselves constitute "take" in the court's narrow conception. Even Justice Scalia acknowledged in his dissent in *Sweet Home* that similar words in the ESA's statutory definition of "take" expanded the word "take" from the common law definition—although he minimized the importance of this fact by characterizing the expansion as "slight[]," "not unusual[]," and in the service of merely clarifying that the "process of taking" is included in the definition.[197] More importantly, the *majority* in *Sweet Home* expressly noted that some of the verbs included in the ESA's statutory definition of "take," including "pursue" and "wound," are inconsistent with the asserted "established definition" of "take."[198] Thus, because the applicable regulatory definition of "take" includes these terms, it undermines, rather than supports, the *CITGO* court's position.

In any case, even if the *CITGO* court's conclusion with respect to "take" were correct, the question of the scope of "kill" would remain. Had the court actually grappled with the prohibition of "kill," there would have been little basis for it to conclude that "kill" should be interpreted as applying only in a hunting and poaching context. There is certainly no common-law definition suggesting that wildlife can only be killed by hunters. The court's opinion did include a footnote suggesting that the result of the analysis under "kill" would be the same, but that footnote is unconvincing dicta.[199] First, the *CITGO* court stated that the court in *FMC* questioned whether "kill" has any independent meaning in this context. Quite apart from failing to acknowledge the basic canon of statutory construction to avoid interpreting a statute in a way that renders any word superfluous or unnecessary,[200] the *CITGO* court failed to note that the court in *FMC* upheld application of the "kill" prohibition to an instance of incidental take. Second, the *CITGO* court argued that because another statute, the Migratory Bird Conservation

---

[194] *CITGO*, 801 F.3d at 489.

[195] *Id.* at n.11 (citing 50 C.F.R. § 10.12); *see also id.* at 491.

[196] 50 C.F.R. § 10.11; *see also id.* at § 10.1 (listing the eight statutes to which the "General Provisions" of Part 10 apply).

[197] 515 U.S. at 718 (Scalia, J., dissenting).

[198] 515 U.S. at 698 n.10; *see also* Bean and Rowland at 213, *supra* note 96 ("the terms 'wound' and 'kill' implied an intent to prohibit activities based on their consequences rather than the intent of the persons responsible for them.").

[199] *CITGO*, 801 F.3d at 489 n.10.

[200] 2A NORMAN J. SINGER & J.D. SHAMBIE SINGER, STATUTES AND STATUTORY CONSTRUCTION § 46:6 (7th ed. 2008).

Act, defines "take" to include "kill,"[201] "kill" may have little independent force. I conclude, however, that the inclusion of "kill" in the definition of "take" in that statute indicates that Congress had already abandoned the narrow common-law conception of "take." Finally, the *CITGO* court's footnote seriously mischaracterized footnote 10 of the majority opinion in *Sweet Home*. The majority stated that "*most of*" the terms in the ESA's take definition "refer to deliberate actions *more frequently* than does 'harm[.]'"[202] The majority did not say that "kill" fits that description, and the majority later reached the opposite conclusion.[203]

Some of the *CITGO* court's remaining discussion of "take" might also be viewed as applying to "kill," but as discussed below, this analysis is also flawed. For example, the court claimed that it was following the Ninth Circuit decision in *Seattle Audubon*.[204] The *CITGO* court, however, made a different distinction than that made by the *Seattle Audubon* court. As discussed above, *Seattle Audubon* distinguished between direct and indirect (habitat modification) take, and thus expressly distinguished, rather than rejected, the holdings of *FMC* and *Corbin Farm Service*. *Seattle Audubon* should not be read as holding that *direct* incidental taking or killing, such as that at issue in *CITGO*, is not prohibited by the MBTA.[205] The *CITGO* court also claimed to be following *Newton County Wildlife Ass'n v. U.S. Forest Service*,[206] but failed to indicate that the relevant discussion in that case is unclear because of its use of "indirectly,"[207] and in any case is merely dicta.[208]

---

[201] 16 U.S.C. § 715*n*.

[202] 515 U.S. at 698 n.11 (emphases added).

[203] *Id.* at 701.

[204] *CITGO*, 801 F.3d at 488–89.

[205] This conclusion is supported by the Ninth Circuit's recent decision in *Protect our Cmtys. Found.*, 825 F.3d 571. That case involved a challenge to a right of way that the Bureau of Land Management (BLM) issued for a wind-energy facility. Plaintiffs claimed that BLM violated the MBTA and the APA by not obtaining authorization to incidentally take the birds that would die as a result of the operation of the wind facility. The Ninth Circuit held that there was no violation because the prohibitions of the MBTA do not apply to agencies that act in a purely regulatory capacity. *Id.* at 586. The court would not have needed to reach this conclusion if the *CITGO* court's interpretation of *Seattle Audubon* was correct: the Ninth Circuit could have simply followed its own precedent and held that the take was merely incidental, and therefore not prohibited by the MBTA. Instead, the Ninth Circuit noted that BLM's actions would not "directly or proximately cause" the take, *id.*, thus recognizing and applying the correct understanding of *Seattle Audubon*'s holding. *See also Protect our Cmtys. Found. v. Black*, No. 14-cv-2261 JLS (JMA), at 14 n.8 (S.D. Cal. Mar. 29, 2016) (stating that FWS has authority to authorize incidental take under the MBTA).

[206] *CITGO*, 801 F.3d at 488.

[207] 113 F.3d 110, 115 (8th Cir. 1997) (stating that "conduct, such as timber harvesting, that *indirectly* results in the death of migratory birds" is not subject to strict liability) (emphasis added).

[208] *Id.* ("Our conclusions about the apparent scope of [the] MBTA are necessarily tentative because we lack the views of the Fish and Wildlife Service."). Several legal commentators reviewing the applicability of the MBTA to incidental take have repeated this same error, arguing that the Eighth and Ninth Circuits are part of a split in the Circuit Courts, joining the Fifth Circuit in holding that the MBTA does not prohibit take outside the realm of hunting and poaching, with the Second and Tenth Circuits holding that the MBTA prohibits incidental take. *See, e.g.,* Sara Orr & Jennifer Roy, *Court Limits Migratory Bird Treaty Act Applicability to Incidental Take*, Latham's Clean Energy Law Report, Sept. 17, 2015, available at http://www.cleanenergylawreport.com/environmental-and-approvals/court-limits-migratory-bird-treaty-act-applicability-to-incidental-take/ ("the Eighth and Ninth Circuits have concluded that the scope of the MBTA should be limited to exclude incidental take"). *But cf.* Gerald George, *Migratory Bird Treaty Act Narrowly Interpreted: the Fifth Circuit Joins the Eighth and Ninth Circuits*, Energy & Environmental Law Blog, Sept. 10, 2015, available at http://www.energyenvironmentallaw.com/2015/09/10/migratory-bird-treaty-act-narrowly-interpreted-the-fifth-circuit-joins-the-eighth-and-ninth-circuits/ (correctly describing the narrow holdings of the Eighth and Ninth Circuit

The *CITGO* court compared the MBTA to the ESA and the MMPA, statutes in which, the court asserted, Congress expressly modified the common-law definition of "take" by including terms like "harm" and "harass," thus covering "accidental or indirect harm to animals."[209] "Harm and harass are the terms Congress uses when it wishes to include negligent or unintentional acts within the definition of 'take.' Without these words, 'take' assumes its common law definition."[210] However, the words on which the court relies, "harm" and "harass," do not necessarily implicate incidental take any more than does "take" itself. As with "take," harmful and harassing acts may be directed at protected animal species or be incidental in nature. Moreover, "kill" is also a term that Congress uses when it wishes to prohibit incidental take—as Congress did in the MBTA. Thus, the MBTA's take prohibition is narrower than that of the ESA—but not because the MBTA requires scienter. Rather, as held by *Seattle Audubon*, the exclusion of "harm" and "harass" in the MBTA exclude it from applying to indirect (habitat modification) take.

The *CITGO* court's treatment of Congress's mandate of an exception for take incidental to military-readiness activities is likewise unconvincing.[211] The court simply failed to grapple with the fact that legislation would have been entirely unnecessary if the court's interpretation is correct. And if Congress thought that commercial activities not directed at migratory birds should fall outside the MBTA, it would not have excluded the "operation of industrial activities" from the definition of "military readiness activities."[212] At the same time, the court mischaracterized the government's argument, stating that the government's position was that the military-readiness legislation "implicitly and hugely expanded" the scope of the MBTA.[213] It would have made little sense for the government to stake out such a position against the backdrop of several decades of agency practice interpreting the MBTA to prohibit incidental take. In fact, the military-readiness legislation fills the same role with respect to the MBTA as the 1982 amendments to ESA do to the original 1973 ESA: in both cases, the later legislation would make no sense if the scope of the original legislation was as narrow as some were arguing.[214] Thus, the later legislation did not change the scope of the original enactment at all, but rather it helped to clarify the proper interpretation of the original enactment. Similarly, *Mahler*'s dismissal of the import of the 1986 amendment to the felony provision and the associated committee report language[215] fails to acknowledge the fact that the 1986 amendment post-dates the *FMC* and *Corbin Farm Service* cases. The 1985 Kesterson Hearings clearly

---

Courts as declining to "apply the MBTA to habitat modification that would foreseeably result in bird mortalities."). But, as discussed above, neither the Eighth nor Ninth Circuits have clearly and expressly held that the MBTA does not apply to incidental take. To be sure, there is currently a split in the Circuits on whether the MBTA prohibits incidental take, but it can only be accurately described as a split between the Second and Tenth Circuits on one side and the Fifth Circuit on the other (and even the Fifth Circuit has not definitively ruled on whether the prohibition of "kill" applies to incidental take).

[209] *CITGO*, 801 F.3d at 490.

[210] *Id.* at 491; *see also id. at* 490.

[211] *Id.* at 490–91.

[212] Bob Stump National Defense Authorization Act for Fiscal Year 2003, § 315(f)(2)(B), Pub. L. No. 107-314, 116 Stat. 2509 (2002).

[213] *CITGO*, 801 F.3d at 490–91.

[214] *See Sweet Home*, 515 U.S. at 700–01 (1982 amendments allowing FWS to authorize incidental take supported interpretation that incidental take prohibited).

[215] *Mahler*, 927 F. Supp. at 1580–81,

demonstrate that Congress knew of the executive branch's interpretation of the MBTA at the time.[216]

Similarly, the *CITGO* court's rejection of *FMC* and *Apollo Energies* depends entirely on the *CITGO* court's erroneous conclusion regarding "take." The *CITGO* court claimed that *FMC* and *Apollo Energies* confused *mens rea* and *actus reus*.[217] In fact, the *CITGO* court committed precisely the error of which it accused its sister circuits, by grafting a scienter component onto the prohibited act.[218] The court was correct insofar as the fact that the MBTA is a strict-liability crime does not mean that everything is a violation of the MBTA—the defendant must carry out the prohibited act. The court, however, misunderstood what the prohibited act is. Under the MBTA, it is *any* affirmative act that proximately causes a protected bird to die.

The *CITGO* court's argument that the FWS interpretation would lead to "absurd results"[219] is belied by the experience of the last 45 years. As discussed above, the government has consistently taken the position that the MBTA applies to incidental take. Contrary to the court's intimation, the societal impact has been minimal, and largely positive. Oil pits have been netted, power lines made less dangerous, and bird mortality reduced from what it would otherwise be, all at little societal cost. FWS OLE and DOJ have been judicious in bringing MBTA charges. And, as noted above, FWS is currently engaged in a process to reduce reliance on enforcement discretion by providing authorization for incidental take in appropriate circumstances.

The *Mahler* court made two related arguments, both of which are unconvincing. First, the lack of a history of MBTA prosecutions in the logging context does not have the significance that *Mahler* attributed to it. An agency's decision not to prosecute is generally committed to the agency's absolute discretion.[220] Although it is true that the government has generally not prosecuted logging-related bird deaths under the MBTA,[221] the court did not mention the government's enforcement activity in other incidental-take contexts.[222] The government has subsequently publicly explained how its enforcement priorities relate to logging and MBTA violations.[223] The *Mahler* court's failure to recognize the proper role of enforcement discretion led the court to use unsupportable circular logic. In effect, the court argued that the MBTA cannot apply to logging because the government has not enforced the MBTA in that context, and

---

[216] *See Moon Lake*, 45 F. Supp. 2d at 1075; *see also Andrus v. Allard*, 444 U.S. 51, 57 (1979) (it is particularly relevant that Congress twice reviewed and amended statute without disturbing agency interpretation). The Kesterson Hearings addressed whether the operation of a contaminated reservoir that attracted and poisoned waterfowl violated the MBTA. *See, e.g., Drainage Problems and Contamination at Kesterson Reservoir: Hearings before the Subcomm. on Water and Power Resources of the House Comm. on Interior and Insular Affairs*, 99th Cong. 10–19 *et seq.* (1985).

[217] *CITGO*, 801 F.3d at 492.

[218] *See* 1 LaFave, Substantive Criminal Law § 5.2(a) (2d ed. 2003) ("intention to produce a specified result" is an element of *mens rea* or scienter, not *actus reus*).

[219] *CITGO*, 801 F.3d at 494.

[220] *Heckler v. Chaney*, 470 U.S. 821, 831 (1984).

[221] *Mahler*, 927 F. Supp. at 1581.

[222] *See Moon Lake*, 45 F. Supp. 2d at 1083.

[223] Response of the United States of America to the Submission Made by the Alliance for the Wild Rockies, et al. Under Article 14 of the North American Agreement on Environmental Cooperation, at 11–18 (Feb. 29, 2000), *available at* http://www.cec.org/sites/default/files/submissions/1995_2000/8475_99-2-rsp-e.pdf (last visited Dec. 2016).

then implies that the government's enforcement of incidental take in other contexts is erroneous because those contexts are indistinguishable from logging.

Second, *Mahler* found support for its conclusion in what it characterized as the "apparent lack of any meaningful limits" on liability under the MBTA if the MBTA applies to incidental take.[224] *Mahler*, however, failed to recognize that meaningful limits on liability under the MBTA do exist.  Those limits include: (1) legal authorization in accordance with regulations promulgated under section 2(a) of the MBTA;[225] (2) consistent with *Seattle Audubon*, the MBTA's applicability only to take that is proximately caused by an action (direct incidental take as opposed to indirect incidental take);[226] and (3) enforcement discretion, by which FWS and DOJ may address possible due-process concerns by taking into account the foreseeability of the take.[227]  Together, these limitations more than meet any need for a "reasonable principle to limit the broad reading" of the MBTA.[228]

In light of the above analysis, I reach the following conclusions.  First, using all of the traditional rules of statutory construction, and in the broad context of section 2 of the MBTA, the prohibitions of "take" and "kill" unambiguously apply on a strict-liability basis (except in the context of felony prosecutions and baiting cases) and to incidental take.  Second, even if the traditional common-law meaning of "take" introduces some ambiguity as to whether that term applies to incidental take, "kill" is unambiguous.  Third, even if "take" and "kill" were both considered ambiguous in this context, I conclude that the best reading of the MBTA is that these prohibitions apply to incidental take.  Fourth, I conclude, consistent with *Seattle Audubon*, that the causal connection between an action and indirect take of migratory birds (for example, take caused solely by the long-term effects of habitat modification) is too attenuated for liability to attach.

## VI.    CONCLUSION

Based on the analysis above, I conclude that the MBTA's prohibitions on taking and killing migratory birds apply broadly to any activity, subject to the limits of proximate causation, and are not limited to certain factual contexts.  Therefore, those prohibitions can and do apply to direct incidental take.

Hilary C. Tompkins

---

[224] *Mahler*, 927 F. Supp. at 1582.
[225] 16 U.S.C. § 704(a).
[226] *Seattle Audubon*'s distinction between direct take and indirect take (*e.g.*, take caused solely by the long-term effects of habitat modification) reflects principles of causation.  Proximate causation requires an action to be sufficiently related to the result caused to make legal culpability appropriate.
[227] *See Apollo Energies*, 611 F.3d at 690.
[228] *See Mahler*, 927 F. Supp. at 1582–83.

# APPENDIX B

# JORJANI OPINION



# United States Department of the Interior

FISH AND WILDLIFE SERVICE

Washington, D.C. 20240

APR 1 1 2018



In Reply Refer To:
FWS/AMB/067711

Memorandum

To:         Service Directorate

From:       Principal Deputy Director

Subject:    Guidance on the recent M-Opinion affecting the Migratory Bird Treaty Act

To ensure consistency with the recently issued M Opinion, the U.S.Fish and Wildlife Service
(FWS) is modifying some policies and practices within its programs. This memorandum
provides guidance to clarify what constitutes prohibited take, what actions must be taken when
conducting lawful intentional take (e.g., obtain a permit via 50 C.F.R. Part 21), and what changes
to prior practice should be made in light of the M-Opinion.

The M-Opinion concludes that the take of birds resulting from an activity is not prohibited by the
MBTA when the underlying purpose of that activity is not to take birds.  We interpret the M-
Opinion to mean that the MBTA's prohibitions on take apply when the *purpose* of an action is to
take migratory birds, their eggs, or their nests. Conversely, the take of birds, eggs or nests
occurring as the result of an activity, the purpose of which is not to take birds, eggs or nests, is
not prohibited by the MBTA.

The mission of the Service is to work with others to conserve, protect, and enhance fish, wildlife,
plants, and their habitats for the continuing benefit of the American people. Migratory bird
conservation remains an integral part of our mission. Further:

1.  The Endangered Species Act (16 U.S.C. 35 § 1531 et seq.; ESA) and Bald and Golden
    Eagle Protection Act (16 U.S.C. §§ 668-668c; Eagle Act), as well as some State laws and
    regulations are not affected by the M-Opinion.

2.  The National Environmental Policy Act (NEPA, 42 U.S.C. § 4321 et seq.) provides a
    process under which federal agencies must evaluate the impacts of their actions on the
    human environment [including the natural and physical environment and relationship of
    people with that environment (40 C.F.R. § 1508.14)] and provide transparency to the
    American public. Birds are part of the human environment, and should be included in
    relevant environmental review processes as directed by NEPA.

The Service will continue to work with any partner that is interested in voluntarily reducing
impacts to migratory birds and their habitats. We will continue to develop best management
practices to protect migratory birds and their habitats in partnership with any industry, federal,
state, and tribal entity as interest dictates, and in the course of project review, will continue to

provide recommendations through our advisory role under other authorities, including NEPA and the Fish and Wildlife Coordination Act (16 U.S.C. §§ 661-667e). The Service will clearly communicate relevant authorities under which we make our recommendations. The Service will ensure that our comments, recommendations, or requirements are not based on, nor imply, authority under the MBTA to regulate incidental take of migratory birds. Furthermore, the Service will not withhold a permit, request, or require mitigation based upon incidental take concerns under the MBTA. Attached is a set of questions and answers that serve to clarify the effect of the M-Opinion.

If you have additional questions, please contact the Migratory Bird Program, 202-208-1050.

Attachment

**ATTACHMENT**

**FREQUENTLY ASKED QUESTIONS REGARDING IMPLEMENTATION OF THE M-OPINION**

1. **Clarity on the distinction between *intent* to take a bird versus *knowing* a bird will be taken. Does the underlying legality of an activity that takes birds affect that distinction and does *reducing a bird to possession* have any bearing on the situation? The following examples are real situations the Service may face under the new M-Opinion:**

    a. **A State Department of Transportation wants to paint a bridge. Prior to painting the bridge, all Barn Swallow nests are pressure washed off the bridge, which would result in destruction of eggs and death of nestlings. Is the intentional removal of nests prior to painting the bridge intentional take and does it require a permit prior to the action?**

    Answer: Yes. The intentional removal of active barn swallow nests, killing eggs and nestlings, is an affirmative act that has the taking of active nests and contents as its purpose. Because this example stipulates that the removal of nests prior to painting was purposeful, a permit would be required to legally authorize this activity. If the intent was to simply paint the bridge and the nests were accidentally destroyed incidental to that process, that destruction would not violate the MBTA.

    b. **A homeowner knows that Chimney Swifts are nesting in their chimney. If the homeowner lights a fire and destroys the nests, is this considered intentional take or incidental take under the M-Opinion?**

    Answer: Possibly either, but more information is needed to determine whether the homeowner lit the fire to intentionally destroy swift nests or simply lit the fire to heat the house. The difference between this activity and the previous example is the subjective purpose of the activity. The intentional destruction of chimney swift nests by lighting a fire would constitute an intentional act, the purpose of which is to destroy nests. Whether lighting the fire violates the MBTA in that scenario would also depend on whether nests are active and contain eggs, young, or adult birds that could not escape quickly enough. A permit would be required to legally authorize this activity if the purpose is to destroy nests and they are active. A permit would not be needed if the homeowner lit the fire for the purpose of heating the house regardless of whether they were aware of swift nests in the chimney. Note that although knowledge of the presence of a nest or nests before lighting a fire would not be enough by itself to constitute a violation of the Act, it could be used as evidence to show the homeowner did in fact light the fire with the purpose of destroying the nests.

c.  **Is removing a structure (e.g., dilapidated barn) with known nesting owls in the barn, which will die with the destruction of the barn, a violation of MBTA? How does knowledge or reasonable foreseeability that that an activity will kill birds affect whether that action violates the MBTA?**

Answer:  This would not be a violation of the MBTA. Removing or destroying the structure would rarely if ever be an act that has killing owl nestlings as its purpose. Again, the purpose of the activity determines whether this is an MBTA violation. Unless the purpose of removing the structure was in fact to kill the owls, their deaths would be incidental to the activity of removing the barn. The landowner's knowledge, or whether it was reasonably foreseeable, that destroying the barn would kill the owls is not relevant. All that is relevant is that the landowner undertook an action that did not have the killing of barn owls as its purpose.

This same analysis would apply to other structures, such as bridges.

d.  **A rancher shoots Black Vultures on his property without obtaining a depredation permit (50 C.F.R. § 21.41 – Depredation Permits). The rancher leaves the dead birds without subsequently collecting (possessing) them. Does the desire to, or failure to reduce a bird to possession affect whether that action violates the MBTA?**

Answer: Shooting Black Vultures without a permit violates the MBTA because it is an affirmative action that has killing birds as its purpose. The traditional definition of the term "take" includes reducing wildlife to human control, as noted in the M-Opinion. However, purposeful killing does not necessarily require any desire or affirmative action to gain possession of the birds. Shooting and killing migratory birds renders them subject to human control whether or not the shooter physically takes possession of the bodies. In fact, this issue was expressly addressed in footnote 132 of the M-Opinion: "We note that this language makes clear that the sort of 'human control' referred to by Justice Scalia includes the act of intentionally killing even in the absence of further intent to reduce the particular animal to human possession. Thus, intentional killing is itself a form of 'human control'." Note that shooting at and missing a black vulture would also be a violation (attempt), which obviously could not result in reducing the bird to possession.

2.  **How does the legality of an activity affect the determination of whether it is an MBTA violation or not? For example, if an illegal activity kills birds, but that was not the intent of the activity (e.g., using a banned pesticide, or without following application labels in violation of Federal Insecticide Fungicide Rodenticide Act (FIFRA)) is this still considered an incidental taking that is not a violation of the MBTA?**

Answer: The legality of an activity does not affect the determination of whether it results in an MBTA violation. Thus, if the landowner in the example used the pesticide with specific intent to kill birds, it would violate the MBTA. However, if the landowner used a pesticide to purposely kill something other than migratory birds, it would not be a violation if birds die as

a result because the purpose of the act was not taking of birds. If the landowner used a pesticide with the general intent of killing wildlife, and the pesticide killed protected bird species, that could be a violation of the MBTA but liability would likely turn on the facts of the specific case. Note, applying a pesticide illegally in a way that ends up killing birds when they are not the intended target may not be an MBTA violation, but the fact that birds died may still provide additional evidence for prosecuting the FIFRA violation.

3. **How does the M-Opinion affect existing statutory amendments to the MBTA that specifically address incidental take, such as P.L. 107-314, Sec. 315 and subsequent regulation (50 C.F.R. § 21.15 – Authorization of take incidental to military readiness activities) or P.L. 114-94, Sec. 1439 (the FAST Act)?**

Answer: The M-Opinion does not affect the military-readiness rule at 50 C.F.R. § 21.15, which was the result of Congress's direction to the Secretary of the Interior to prescribe regulations authorizing incidental take of migratory birds during military-readiness activities. Thus, the Secretary could only withdraw the rule if directed to do so through subsequent legislation. As the M-Opinion explains, "Congress was acting in a limited fashion to preempt a specific and immediate impediment to military-readiness activities." M-Opinion, p. 31. FWS and the Department of Defense (DOD) should continue to follow the requirements of the military-readiness rule. Nonetheless, incidental take of migratory birds by DOD does not violate the MBTA, regardless of whether DOD is complying with the terms of the military-readiness rule.

The FAST Act authorizes take of nesting swallows that interfere with bridge construction in certain circumstances. In most circumstances, such take would be considered purposeful and thus prohibited by the MBTA. Accordingly, the M-Opinion should not affect authorization of the take of active swallow nests. To the extent the FAST Act was intended to authorize incidental take, the terms of that statute should still be complied with for the same reasons discussed above for the military-readiness rule legislation.

4. **What effect does the M-Opinion have on current settlement agreement negotiations to address incidental take of migratory birds or court-mandated permits resulting from past settlement agreements?**

Answer: Current settlement agreement negotiations should not address incidental take of migratory birds for purposes of enforcing the MBTA, but may still include measures necessary to comply with other relevant statutes when appropriate (for example statutes implemented by the Natural Resource Damage Assessment and Restoration program (NRDAR, as explained below). The Department is currently reviewing the Service's position on current negotiations to address incidental take of bald and golden eagles under the Eagle Act. These species are also covered under the MBTA. The Service has brought seven enforcement actions against companies for incidental take of eagles since 2015, which included both MBTA and Eagle Act charges. Only one of these remains unresolved; the other six were resolved through settlement agreements. The Service will no longer pursue MBTA charges against projects that cause eagle deaths, but the M-Opinion does not affect the Service's ability to bring Eagle Act claims in these cases.

We are not aware of any court-authorized settlement agreements that mandate obtaining a permit to cover future incidental take of migratory birds under the MBTA. Since 2013, the Department of Justice has brought two prosecutions for take of eagles and species protected only by the MBTA. These prosecutions were resolved at the request of defendants based on MBTA violations only, although the conduct could also have been charged under the Eagle Act with regard to the eagle deaths. These plea agreements provided that companies must implement plans aimed at preventing bird deaths at eight commercial wind projects and apply for eagle permits to cover incidental take of eagles under the Eagle Act. The Service Chief of Law Enforcement's Directive applying to civil administrative enforcement of avian take at wind projects includes a limited option for settlements to resolve violations of the MBTA. However, that option is no longer operable after issuance of the M-Opinion. We are currently determining whether the M-Opinion will require the Service to revisit past settlement agreements that require ongoing implementation of best management practices to avoid or reduce incidental take of migratory birds by wind-energy facilities and other industrial activities.

5. **How does the M-Opinion affect the Natural Resources Damage Assessment program (i.e., specifically related to oil spills)?**

Answer: The M-Opinion does not directly affect the NRDAR program because statutory authorities that provide the basis for the program do not include the MBTA. Pursuant to Comprehensive Environmental Response Compensation and Liability Act, Oil Pollution Act, and Clean Water Act, the Department is authorized to assess injury to natural resources caused by releases of hazardous substances and discharges of oil to compensate the public for lost natural resources and their services. The Department's assessment of natural resource injuries under the NRDAR program include any injury to migratory birds, which in many cases could otherwise be classified as incidental take.

In practice, however, the M-Opinion will have an effect on future claims seeking fines or penalties for violations of the MBTA from companies responsible for oil spills and hazardous releases. In addition to pursuing damage claims under the NRDAR program, the Department has pursued MBTA claims against companies responsible for oil spills that incidentally killed or injured migratory birds. That avenue is no longer available.

6. **How does the M-Opinion affect consultations or habitat conservation plans under sections 7 and 10 of the ESA?**

Answer: When processing Habitat Conservation Plans under Section 10 or consulting on Section 7 of the ESA, incidental take coverage should only include listed species listed under the ESA. As concluded in the M-Opinion, incidental take of migratory birds is not prohibited so no restrictions, minimization measures, or mitigation should be part of an incidental take permit or an incidental take statement for purposes of the MBTA (rather than the ESA). An applicant or federal government action agency can take voluntary measures related to migratory birds but it must be made clear that no such actions are required by the MBTA.

7. **How does the M-Opinion affect technical assistance under the Avian and Bat Conservation Plans?**

Answer:  Technical assistance can still be given in development of Avian and Bat Conservation Plans. However, any suggestions or guidance related to migratory birds must be relayed as completely voluntary actions. Part of the technical assistance should include the statement that incidental take of migratory birds is not prohibited by the MBTA.